COOK, APPELLANT, *v.* MACGINNISS, RESPONDENT.

(No. 5,641.)

(Submitted January 6, 1925. Decided February 7, 1925.)

[233 Pac. 129.]

*Trusts and Trustees—Express Trust—Statute of Limitations— Appeal—Cross-assignments of Error—When not Reviewable on Appeal—Cross-appeal—When Required—Witnesses.*

Appeal—Right to Make Cross-assignments of Error Statutory.
   1. The right to make cross-assignments of error is purely statutory and in the absence of a compliance with the requirements of the statute they cannot be considered on appeal.

Same—Cross-assignments of Error—Scope of Statute.
   2. Section 9751, Revised Codes of 1921, authorizing review of cross-assignments of error on appeal, has application only to cases in which the respondent makes cross-assignments upon errors in rulings adverse to him and preserved in a bill of exceptions, its purpose being to enable the supreme court to determine whether

[72 Mont. 280.]

those complained of by the appellant were compensated or rendered harmless by reason of those complained of by respondent.

Same—When Cross-assignments of Error not Reviewable on Appeal.
　3. Where the causes of action stated in the complaint and those set forth in several counterclaims were separate and distinct, requiring a separate finding upon each, and the appeal by plaintiff presented for review matters having to do with the judgment against him on one counterclaim alone, any errors committed against appellant on the trial of that counterclaim could not be compensated or rendered harmless (par. 2 above) by errors committed against the respondent on the trial of the cause of action set forth in the complaint or the other counterclaims, and therefore his cross-assignments as to them were not reviewable on plaintiff's appeal.

Same—Cross-assignments of Error—When Cross-appeal Necessary.
　4. Where respondent desires a review of rulings of the trial court upon a cause of action separate and distinct from that which the appellant seeks to have reviewed on his appeal, he must prosecute a cross-appeal, even though the causes were tried in the same action, section 9751, Revised Codes of 1921, authorizing review of cross-assignments of error not being intended to do away with the necessity of a cross-appeal under such conditions.

Trusts and Trustees—Express Trust—Statute of Limitations.
　5. As between the trustee of an express trust and the *cestui que trust*, the statute of limitations commences to run from the date of the disavowal of the trust by the trustee, and knowledge of such disavowal by the *cestui que trust*.

Same—Express Trust Resting in Parol—Action Barred by Statute of Limitations.
　6. Under the above rule (par. 5), *held*, that where the relationship of plaintiff and defendant in the acquisition of securities was that of trustee and *cestui que trust*. under an express parol agreement to share in the profits, and the former repudiated the relationship in 1912, before the sale of the securities, with the knowledge of the latter, defendant's claim for an interest in the proceeds of the transaction asserted in 1921 was barred under subdivision 1 of section 9030, Revised Codes of 1921, providing that an action upon a contract, promise, *etc.*, not founded on an instrument in writing must be brought within five years.

Same—Statute of Limitations—Absence of Party from State—Tolling of Statute—Evidence—Insufficiency.
　7. Evidence *held* not to sustain the contention that the running of the statute of limitations had been tolled, under section 9048, Revised Codes of 1921, by reason of the absences from the state of the party pleading it.

Evidence—Party Bound by Testimony of His Witness.
　8. A party calling his opponent as his witness is bound by his testimony even though elicited upon his cross-examination.

---

　6. Application of statute of limitations between trustee and beneficiary of express trust, see notes in 3 Ann. Cas. 200; 13 Ann. Cas. 1165; Ann. Cas. 1917C, 1018.
　8. Right of party calling adversary as witness to impeach or discredit him, see notes in 6 Ann. Cas. 711; 13 Ann. Cas. 737.

*Appeal from District Court, Silver Bow County; Wm. E. Carroll, Judge.*

Action by A. B. Cook against John MacGinniss. From a judgment for defendant on a counterclaim plaintiff appeals. Reversed and remanded.

*Messrs. Gunn, Rasch & Hall* and *Messrs. Walker & Walker,* for Appellants, submitted a brief; *Mr. M. S. Gunn* argued the cause orally.

The cause of action stated in the second counterclaim is barred by the statute of limitations (subd. 1, sec. 9030, Rev. Codes 1921), unless the absence of the appellant from the state tolled the running of the statute as provided in section 9048.

The burden of proof was upon respondent to show that appellant was not within the state five years between February 1, 1913, the time of the accrual of the cause of action, and August 11, 1921, the date of the filing of the complaint and the commencement of the action. (*Pierce* v. *McClellan,* 93 Ill. 245; *Mason* v. *Henry,* 152 N. Y. 529, 46 N. E. 837; *Cott* v. *Baker,* 112 Kan. 115, 210 Pac. 651; *Neal Commission Co.* v. *Golston* (Tex. Civ.), 197 S. W. 1124; *Crissey* v. *Morrill,* 125 Fed. 878, 60 C. C. A. 460; *Kammann* v. *Barton,* 23 S. D. 442, 122 N. W. 416, p. 418; *Shaw* v. *Dickinson,* 65 Okl. 186, 164 Pac. 1150; *Vanselous* v. *McClellan,* 57 Okl. 742, 157 Pac. 923.)

The allegation that the respondent did not know of the sale of the securities by the appellant until 1918 is wholly immaterial. It is not alleged, nor is there any proof, that the appellant in any manner concealed from the respondent that the securities had been sold. (*Yore* v. *Murphy,* 18 Mont. 342, 45 Pac. 217; *Bennett* v. *Meeker,* 61 Mont. 307, 202 Pac. 203; *Ott* v. *Hood,* 152 Wis. 97, Ann. Cas. 1914C, 636, 44 L. R. A. (n. s.) 524, 139 N. W. 762.)

This testimony of the appellant, as a witness for respondent, is the only testimony as to the whereabouts of the plaintiff and

the time he was in Montana during the years 1913 to 1921, inclusive. According to this testimony he was in Montana sixty-six months during those years, and if he was absent during the entire month of January, 1913, and during the entire time from August 21, 1921, to the end of the year, he was still within Montana more than five years between the first day of February, 1913, and the twenty-first day of August, 1921, and the cause of action is barred. (*Stoudt* v. *Hanson,* 62 Mont. 422, 205 Pac. 253; *Pierce* v. *McClellan,* 93 Ill. 245.) Respondent was bound by the testimony of his own witness. (*Sommerville* v. *Greenhood,* 65 Mont. 101, 210 Pac. 1048; *Tebay Land & Livestock Co.* v. *Hastie,* 64 Mont. 509, 210 Pac. 605; *Giebler* v. *Giebler* (Mont.), 222 Pac. 436.) It was held in *Schroer* v. *Brooks,* 204 Mo. App. 567, 224 S. W. 53, 54, that: ''One is not absolutely bound by the testimony of a witness called by him, but is bound when the testimony of such witness is the only evidence adduced concerning the matter in question.'' (*Rodan* v. *St. Louis Transit Co.,* 207 Mo. 392, 105 S. W. 1061.)

In the trial court, in order to avoid the statute of limitations, it was contended for respondent that section 9058 of the Revised Codes of 1921 applies. From a reading of this section it appears that it applies only where a demand is necessary to the maintenance of an action. No demand was necessary in this instance and hence the section does not apply. (*Mills* v. *Mills,* 115 N. Y. 80, 21 N. E. 714; *Gilchrist Transp. Co.* v. *Worthington & Sill,* 193 App. Div. 250, 184 N. Y. Supp. 81; *Baker* v. *Moore,* 4 App. Div. 234, 38 N. Y. Supp. 559; *Cox* v. *Delmas,* 99 Cal. 104, 33 Pac. 836.)

The rule recognized by all of the authorities is that where one person has money to which another is entitled, and there is an immediate duty to make payment, an action may be maintained without a demand. This rule applies whether the party who receives the money is a trustee, an agent, partner or other person acting in a fiduciary capacity. It is the duty to pay that dispenses with the necessity for a demand. (*Stacy*

v. *Graham,* 14 N. Y. 492; *Roberts* v. *Ely,* 113 N. Y. 128, 20 N. E. 606; *Watson* v. *Walker,* 23 N. H. 471.) In the following cases the rule was applied to an agent collecting money: *Mast* v. *Easton,* 33 Minn. 161, 22 N. W. 253; *Jewell* v. *Jewell's Estate,* 139 Mich. 578, 102 N. W. 1059–1061; *Campbell* v. *Roe,* 32 Neb. 345, 49 N. W. 452; *Stacy* v. *Graham,* 14 N. Y. 492; *Young* v. *Kimber,* 44 Colo. 448, 28 L. R. A. (n. s.), 626, 98 Pac. 1132.)

Where it appears that the cause of action is barred by the statute of limitations it is the duty of the court to sustain a motion for a nonsuit or a directed verdict. (*Chowen* v. *Phelps,* 26 Mont. 524, 69 Pac. 54; *City of Butte* v. *Goodwin,* 47 Mont. 155, Ann. Cas. 1914C, 1012, 134 Pac. 670; *Pratt* v. *Pratt,* 29 N. D. 531, 151 N. W. 294.)

*Mr. William T. Pigott, Messrs. Maury & Maury* and *Mr. Geo. D. Toole,* for Respondent, submitted a brief; *Mr. Pigott* and *Mr. H. Lowndes Maury* argued the cause orally.

Appellant's view of the law concerning the statutes of limitation is, we submit, fallacious. A necessary fact to cause the running of the statute is presence of a party who desires to claim the benefit within the state where he plead it for a certain length of time after the accrual of the right of action against him. In this age of modern conveniences and speed in traveling the place which a man chooses to name and call his residence is of very little weight in determining where he actually is at any particular time. A person is presumed to be in his domicile. There are few stronger presumptions. The question of domicile is particularly one for a jury. We say that Mr. Cook's domicile for many years after he got the money of MacGinniss and Wall on January 31 or February 1, 1913, was outside the state of Montana, and was in the state of New York. Mr. Cook does not recite in his testimony having voted in Montana during ten years succeeding February 1, 1913, but even if he had, "The fact of voting at a particular place has been held of slight importance." (14 Cyc. 863.) "Domicile of a married man is presumed to be

at the place where his wife or family resides." (*Id.* 861.) "Declarations made by the party whose domicile is in dispute, whether orally or in a deed, law or other documents, are to be considered in connection with the other facts of the case and given due credit as an index of his intention, written declarations being given greater weight than oral. Such declarations, however, must not be unreasonable in themselves, inconsistent with other facts, or under circumstances creating suspicion as to their integrity." (*Id.*, p. 864.) "Declarations are of no avail when not borne out by the party's acts." (*Id.* 865.)

The interest in the Billings securities arose from an express agreement, that is to say, a direct trust. MacGinniss' rights arose the moment that Mr. Cook purchased and got possession of the Billings securities. There is not the slightest suggestion of fraud or undue advantage in the original purchase of the Billings securities by Mr. Cook. He was acting righteously in purchasing under the agreement with MacGinniss, and therefore it was not a constructive trust; he did not purchase the securities with MacGinniss' money, and therefore it was not a resulting trust. It was a trust. And it was a direct or express trust. Pomeroy sometimes speaks of such as a "true trust." He speaks of the other classes of trusts as "trusts *sub modo.*"

It is claimed in the brief of appellant, that no demand was necessary, and therefore that the statute excepting from the operation of the statute of limitations, actions against trustees, agents, *etc.*, until full knowledge of the transaction, does not apply. Appellant urges upon the attention of the court some New York cases concerning trustees *ex maleficio,* involving resulting trusts and constructive trusts; these are inapplicable.

It is extremely difficult to tell whence our section 9058 came when it was enacted in Montana in 1895. We are led to believe that this statute was the product of the brain of some chancery lawyer well aware of the rule of chancery, that there is no limitation on an action for sustaining an

express trust, and well aware of the justice of such a rule, and desirous of embodying that spirit of justice in the statute law of Montana. We need not go far from home to learn what the legislature of 1895 intended. It is true that the section denying to certain trustees the benefit of the statute of limitations until the beneficiary has full knowledge of the facts, "dates in the Montana law to 1895," and is for actions where demand is necessary. The court can easily determine in what class of actions a demand was necessary in Montana at that time. There is a case which seems to have escaped makers of digests, but which was doubtless familiar to the bench and the bar, and by law, presumably, to the legislature in 1895: *Anderson* v. *Hulme,* 5 Mont. 295, 5 Pac. 865. The headnote fully states the case. "In an action for money had and received by an agent or attorney for use of plaintiff, it is necessary to allege a demand and refusal to pay before recovery can be had, and such demand will not be presumed."

We think the legislature had in mind the rights of beneficiaries, rather than the retreat and repose of voluntary express trustees, in enacting the statute. It has never been the policy of the courts of this country to enforce statutes of repose in favor of trustees in equity where the evidence, and power to produce it, has not been lost. A general rule about trusts and their enforcement in equity is that "Unreasonable delay will bar a proceeding to enforce an implied trust, but mere lapse of time will not bar a subsisting express trust." (16 Cyc. 154.) "A bill is in time when filed within twenty years after a written admission of the trust." (*Anstice* v. *Brown,* 6 Paige (N. Y.), 448.) It has even been said that a lapse of thirty years will not prevent the establishment of a "resulting" trust if the proof is clear. (*Cooksey* v. *Bryan,* 2 App. (D. C.) 557.)

It is firmly settled that in cases of express trust the statute is inapplicable, and no length of time is a bar between the trustee and the beneficiary, so long as the relation continues; the reason universally given for this rule being the obvious

fact that the possession which the trustee has of the property is in accordance with his title and therefore cannot be adverse to the rights of the beneficiary. The rule and its reason apply as well and as cogently to cases in which money is the subject of an express trust as where any other species of property is the subject. Therefore the statute begins to run only from the time when repudiation of the trust by the trustee is clearly and unequivocally brought to the knowledge of the beneficiary, but not before. (*United States* v. *Taylor,* 104 U. S. 216, 26 L. Ed. 721 [see, also, Rose's U. S. Notes].)

To state the rule briefly as applicable here: The statute cannot bar the remedy on the second counterclaim, because Cook, the trustee of an express, voluntary, active, continuing trust, never repudiated or disavowed it to the knowledge of MacGinniss. That MacGinniss might, by the exercise of such diligence as would be requisite in different circumstances, have discovered the sale and resultant profit, did not set the statute in motion; for it was the duty of Cook, as trustee, to declare, not of MacGinniss to ferret out and ascertain, the true state of affairs. (*Bailey* v. *Glover,* 21 Wall. (U. S.) 342, 22 L. Ed. 636 [see, also, Rose's U. S. Notes].)

MR. JUSTICE STARK delivered the opinion of the court.

The complaint in this action, which was filed on August 11, 1921, alleges that on the thirty-first day of October, 1912, the defendant made, executed and delivered to the plaintiff his promissory note for the sum of $15,739.25, due ten months after date, bearing interest at the rate of eight per cent per annum from date until paid; that the plaintiff is the owner and holder of said note and that no part of the principal or interest thereof had been paid, except $5,000, paid on October 13, 1916, $2,500 on November 20, 1917, $1,250 on April 22, 1918, and $1,250 on September 14, 1918; and asks judgment for the amount due on the note together with interest and attorney's fees.

To this complaint the defendant filed an answer on December 14, 1921, in which he admitted the execution and delivery of the note and the making of the payments thereon as alleged in the complaint, and further alleged that said note was not given, made or executed for any consideration whatever; and for affirmative defenses set up four separate counterclaims against the plaintiff, as follows:

(1) For the sum of $23,494.22 and interest, alleged to be due to the defendant from the plaintiff on account of a certain transaction which at the trial was designated the Rochester deal.

(2) For the sum of $33,873.40 together with interest thereon from the first day of February, 1913, the allegations in connection therewith being as follows:

"That heretofore in the months of February, March and April of the year 1911 the plaintiff A. B. Cook and the defendant entered into a certain contract and agreement and joint adventure whereby it was agreed that A. B. Cook and this defendant should purchase" 265 bonds of the Billings Mutual Telephone Company of the par value of $1,000 each, and certain notes of the Interstate Consolidated Telephone Company and the Billings Mutual Telephone Company, the face value of such bonds and notes being $314,025.24 (these bonds and notes were referred to at the trial as the "Billings securities" and will be so designated in this opinion), "for the purpose of reselling the same and making a profit or sustaining a loss, which said profit or loss was to be divided in the proportion of one-fourth to the said defendant and three-fourths to the said plaintiff.

"That the said plaintiff and defendant, but acting in the name of the plaintiff, and pursuant to said agreement, did purchase all of the said securities on or about April 11, 1911, for the sum of $78,506.31. That the said plaintiff took all of the said securities into his own possession, retained the possession of the same, and subsequently on or about January ——, 1923, and without the knowledge of the defendant, resold all

of the said securities for the price of $214,000, all of which money was paid to the said A. B. Cook for the said securities, and thereon and thereby he made a profit of $135,493.69 on the said joint adventure, one fourth of which said profit, to-wit, the sum of $33,873.40, was thereby the property of this defendant John MacGinniss.

"That the said A. B. Cook has never paid to the said John MacGinniss the said sum of $33,873.40, or any part thereof. That he never disclosed to the said John MacGinniss, nor did the said John MacGinniss ever know, any of the facts connected with the sale or the said transaction until the twenty-seventh day of June, 1924, except that the said John Mac-Ginniss had been informed in December, 1918, and about the twenty-seventh day of December, 1918, that the said A. B. Cook had compromised a similar claim of Thaddeus S. Lane for $18,000.

"That by reason of the foregoing facts A. B. Cook, the plaintiff above named, has breached his trust to the said John MacGinniss, and this before the first day of February, 1923, and at all times since, and he has been indebted, and is still indebted to the plaintiff in the sum of $33,873.40, and should be made to pay interest thereon since the said first day of February, 1913, until the same be paid."

(3) For the sum of $5,358.71 with interest at eight per cent per annum from March 1, 1910, alleged to be due the defendant from the plaintiff on account of what was designated as the Silver Bow National Bank note.

(4) For the sum of $7,333.33 on account of what was designated as the State Savings Bank bond. Issue was joined on all these counterclaims.

In his reply to the second counterclaim the plaintiff admitted that he purchased the "Billings securities" for the sum of $78,506.31; that he subsequently sold them for the sum of $214,000, all of which was paid to him; admitted that he had not paid the defendant any part of the money so received from

72 Mont.—19

their sale, but denied all the other allegations thereof, and affirmatively pleaded that the cause of action stated in said second counterclaim was barred by the provisions of subdivision 1 of section 9030, subdivision 3 of section 9031, and also by section 9041, Revised Codes of 1921. Further replying to said second counterclaim, the plaintiff alleged that on or about the fourth day of October, 1912, he rendered the defendant a statement of account between them showing the indebtedness of the defendant to him, from which it appeared that the defendant was then indebted to the plaintiff in the sum of $15,739.25, which statement was accepted and acknowledged by the defendant as being correct, and as evidence of the indebtedness shown thereby to be due and owing to the plaintiff the defendant executed and delivered to the plaintiff the note set out in the complaint, and that by said account stated and the execution and delivery of said note it was then and there agreed that all claims and demands of said defendant against the plaintiff, including the claim and demand set forth in the second counterclaim, were settled and adjusted between them.

The cause came on for trial on the twenty-fifth day of July, 1924. At the close of the testimony the court withdrew from the consideration of the jury the first and fourth counterclaims, and on plaintiff's motion directed a verdict in favor of the plaintiff upon the third counterclaim set out in the answer. The plaintiff also moved the court to direct the jury to return a verdict in his favor upon the cause of action stated in the complaint, which motion was granted, and likewise moved the court to direct the jury to return a verdict in his favor on the second counterclaim, which motion was denied. Thereupon the cause was submitted to the jury upon the defendant's second counterclaim and the plaintiff's reply thereto. The jury returned a verdict in favor of the defendant on the second counterclaim for the sum of $62,628.89, from which was deducted $21,088.89, the amount of the verdict in favor of the plaintiff on the cause of action stated in his complaint,

making a net verdict in favor of the defendant for $41,540. Upon this verdict a judgment was duly entered, and the plaintiff has appealed therefrom.

In the respondent's brief there are eight cross-assignments of [1, 2]  error, the first of which is based upon the action of the court in withdrawing from the consideration of the jury and instructing a verdict against him upon the third counterclaim, and the second has reference to the action of the court in directing a verdict in favor of the plaintiff on the cause of action set out in the complaint. The plaintiff contends that these alleged cross-errors cannot be considered upon this appeal.

In the federal courts and in many state courts, for want of statutory authority, such cross-assignments of error cannot be considered unless a cross-appeal has been taken by the appellee, while in other jurisdictions they are allowed and considered even in the absence of a statute expressly authorizing it.  (3 C. J. 1403.)  In this state we are committed to the doctrine that the right to make cross-specifications of error and have them heard is purely statutory, and that in the absence of a compliance with the statutory requirements they cannot be considered.  (*Thompson* v. *Two Dot Fertilizer Co.*, 71 Mont. 486, 230 Pac. 588.)

If the respondent is entitled to have his cross-assignments of error considered at all, it is by virtue of section 9751, Revised Codes of 1921, which provides: "Whenever the record on appeal shall contain a bill of exceptions or statement of the case properly settled, setting forth any order, ruling or proceeding of the trial court against the respondent, affecting his substantial rights on the appeal of said cause, together with the objection and exception of such respondent properly made, and reserved, settled, and allowed in such bill of exceptions or statement, the supreme court on such appeal shall consider such orders, rulings, or proceedings, and the objections and exceptions thereto, and shall reverse or affirm the cause on said appeal according to the substantial rights of the respec-

tive parties, as shown by the record. And no cause shall be reversed upon appeal by reason of any error committed by the trial court against the appellant, where the record shows that the same result would have been attained had such trial court not committed an error or errors against the respondent.''

The scope of the statute under consideration was declared by this court in *Olcott* v. *Gebo,* 54 Mont. 35, 166 Pac. 300, in an opinion written by Mr. Chief Justice Brantly, as follows: ''It [section 7118, Rev. Codes 1907, which is the same as section 9751, Rev. Codes 1921] has application only to cases in which the respondent makes cross-assignments upon errors on rulings adverse to him and preserved in a bill of exceptions, in order to enable this court to determine whether those complained of by the appellant were compensated or rendered harmless by reason of them.'' This is in harmony with what was said by the court at an earlier date, in *Re Murphy's Estate,* 43 Mont. 353, 116 Pac. 1004, and conforms with the later holding in *De Young* v. *Benepe,* 55 Mont. 306, 176 Pac. 609.

The cause of action stated in the complaint and in each of the [3] four counterclaims set out in the answer are separate and distinct; each is a separate claim depending alone upon its own merits, and has no connection with the other items. A separate finding was required upon each, independent of the others. In effect they constituted five causes of action between the parties, which, for convenience, under our statute, were permitted to be tried together in one suit.

While the appeal in this case is from the whole judgment, the errors assigned by the plaintiff have reference only to the second counterclaim, the finding upon which, as above pointed out, is a distinct and severable part of the entire judgment, based on a state of facts wholly disconnected from the plaintiff's cause of action or either of the other counterclaims set up in the answer. This clearly indicates that it was not the purpose or intent of the plaintiff to bring before this court for review any matters except those connected with the

second counterclaim, and that this is in effect an appeal from that portion of the judgment alone.

There is nothing in the record to indicate that the action of the court in directing the jury to return a verdict in favor of the plaintiff upon the cause of action stated in his complaint or upon the third counterclaim set out in defendant's answer in anywise affected the verdict upon the defendant's second counterclaim. If errors were committed against the plaintiff on the trial of the defendant's second counterclaim, they could not be compensated or rendered harmless by errors committed against the defendant on the trial of the cause of action set out in the plaintiff's complaint or the other counterclaims, because the issues upon each of these different items were separate and independent of the others.

We think the declaration in *Olcott* v. *Gebo, supra,* as to [4] the scope of the section under consideration is correct, and it impels us to the conclusion that it was not intended by this section to do away with the necessity of an appeal by a party to a suit who feels himself aggrieved by the rulings of the court upon a cause of action separate and distinct from that which the appellant seeks to have reviewed on his appeal, even though the causes may have been properly tried in the same suit, and that one who wishes to have such errors reviewed must prosecute a cross-appeal. This was undoubtedly the ultimate conclusion reached by respondent's counsel, for in their brief, at page 36, they say: "The respondent, and his counsel, indulge the expectation that he may by the affirmance of the judgment on this appeal be relieved from prosecuting to final effect before the court an appeal from parts of the judgment injurious to him, which the hastening end of the time limit compels him to initiate, before January, 14, 1925. To avoid the necessity of a split, the respondent announces here with all formality, that such appeal will be dismissed upon affirmance, if so it be of the present appeal."

December 16, 1924, this cause was assigned for hearing on January 6, 1925. By agreement of counsel the respondent's

brief was not filed until December 29, 1924. Immediately thereafter counsel for appellant, in consideration of the above-quoted portion of respondent's brief, made application to this court to have the setting of the case vacated and the hearing continued until after respondent's appeal was perfected, in order that both appeals might be submitted at the same time. When this application came on for hearing, counsel for the respondent in open court announced in the most solemn manner that they expressly withdrew the above-quoted portion of their brief, and stated that they did not intend to and would not prosecute an appeal to this court from the portions of the judgment which were deemed injurious to him. Upon this statement of counsel for respondent the application to vacate the setting of the hearing of the case was withdrawn.

The portions of the judgment which counsel had in mind when they made the above statements in their brief, and in open court, could have been no other than the orders of the court (1) in sustaining plaintiff's motion for a directed verdict upon the cause of action set out in the complaint; (2) withdrawing the first and fourth counterclaims from the consideration of the jury; and (3) directing a verdict in favor of the plaintiff upon the third counterclaim.

If counsel entertained the view that the matters suggested by their first and second cross-assignments of error could properly be considered and determined without an appeal upon the part of the defendant, the language of their brief above quoted and their statements in connection with the application to vacate the setting of the hearing of the appeal were mere idle words; for, if these matters could be considered upon this appeal, the others could likewise be considered, and no appeal was necessary on the part of the defendant.

In our research upon this branch of the case we have discovered but one statute which is at all similar to our section 9751, *supra,* and that is section 8644, Illinois Statutes, Annotated, which reads as follows: "In all cases of appeal to the Supreme Court or Appellate Court, or writ of error, the ap-

pellee or defendant in error may assign cross-errors; and the court shall dispose of the same as in other cases of assignment of error.'' In that state it is held that when a decree is severable—that, is composed of distinct parts having no bearing upon each other—each part may be treated as a distinct decree and an appeal taken from one part without affecting the others, and when an appeal is taken from one part of a severable decree, cross-errors .cannot be assigned as to parts not appealed from. (*Walker* v. *Pritchard,* 121 Ill. 221, 12 N. E. 336.)

In *Oliver* v. *Wilhite,* 201 Ill. 552, 66 N. E. 837, an appeal was taken from an entire decree, but appellant was only attacking one severable portion thereof, and there was a recital in the record to the effect that the appellants did not intend to take an appeal from that part of the decree which affected three of the named defendants. These three defendants, however, assigned cross-errors, questioning that portion of the decree which affected them but which was not included in the part thereof from which appellant intended to appeal. Thereupon appellants entered a motion to strike out these cross-assignments of error. The court sustained this motion and held that since these defendants had not appealed from the portion of the decree deemed injurious to them, and which they sought to question by their cross-assignments of error, that portion of the decree was final as to them.

On the state of the record in this case we think the rule announced in *Oliver* v. *Wilhite, supra,* is applicable here. Since the plaintiff in reality only appealed from that portion of the judgment which was adverse to him, and the defendant expressly waived his right to appeal from the portions thereof which were injurious to him, his cross-assignments of error as to such portions of the judgment should not be considered. The action of the district court thereon, namely, directing a verdict in favor of plaintiff on the cause of action set out in the complaint, and directing a verdict against defendant on the third counterclaim, is final and conclusive, and hence

the first and second cross-assignments of error cannot be considered.

This leaves for consideration only the questions raised by appellant in connection with the second counterclaim and the respondent's cross-assignments of error which have to do therewith.

One of the grounds of plaintiff's motion for a directed verdict [5] in his favor on the second counterclaim, was "that the cause of action therein stated is barred by the statute of limitations." The action of the court in overruling this motion is made the basis of plaintiff's first specification of error. Of course, if this specification is well grounded, a consideration of other phases of the appeal will not be necessary, and hence it will be given our first consideration.

One of counsel's contentions in this connection is that even though it should be held, that, as between the plaintiff and the defendant, the plaintiff at the time he purchased the Billings securities became the trustee of an express trust as to the one-fourth interest therein claimed by defendant, the undisputed testimony showed that plaintiff repudiated the trust in the fall of 1912, before the sale of the securities, and that defendant had actual and personal knowledge thereof at the time; that by reason of these facts the defendant's right of action against the plaintiff as trustee, if any existed, accrued at that time, and became barred at the expiration of five years under the provisions of subdivision 1 of section 9030, Revised Codes of 1921, since the right, if any, was based on an oral agreement.

The rule of law contended for by counsel is undoubtedly correct. As stated by this court in *Mantle* v. *Speculator Mining Co.*, 27 Mont. 473, 71 Pac. 665: "The authorities are uniform in holding that, as between the trustee of an express trust and the *cestui que trust,* the statute of limitations commences to run from the date of the disavowal of the trust by the trustee, and knowledge of such disavowal by the *cestui que trust,*" citing cases. (See, also, 2 Perry on Trusts & Trust

Estates, sec. 864; *Swift* v. *Smith,* 79 Fed. 709, 25 C. C. A. 154; *Buttles* v. *De Baun,* 116 Wis. 323, 93 N. W. 5; *Drake* v. *Wild,* 65 Vt. 611, 27 Atl. 427.) Therefore it becomes necessary to examine the record in order to determine whether the case here is brought within the rule.

The testimony covering the transactions involved in the [6] second counterclaim is quite voluminous; most of it consists of a recital by the witnesses of their recollection of events which transpired many years before they gave their testimony, of which no records were made. Stated as briefly as possible, this testimony discloses that for some years Thaddeus S. Lane, Patrick Wall, the plaintiff, and the defendant had been business associates and had been jointly interested in a number of deals not related to the transactions involved in this controversy. For some time, both before and after April, 1911, these four men were, individually, interested as stockholders in the Billings Mutual Telephone Company and the Interstate Consolidated Telephone Company. Prior to the month of April, 1911, the First National Bank of Billings, and its associate, the First State Bank & Trust Company of Billings, had become insolvent and their affairs placed in the hands of receivers; P. Tillinghast being receiver of the First National, and S. G. Reynolds occupying the same relation to the other institution. Amongst the assets of these defunct institutions were the bonds and notes involved in this lawsuit, and heretofore designated as the Billings securities. Because of their interest as stockholders in these telephone companies and also by reason of the fact that the receivers were pressing for payment of the past-due notes of the companies, it was deemed advisable and advantageous by these four men to obtain title and possession of these securities, if possible, and negotiations were entered into by them looking to that end. It was agreed by them that they would purchase the securities, each to contribute one-fourth of the amount required for that purpose and that the profits or losses resulting from the transaction should be shared or borne in that proportion.

To consummate this deal, the plaintiff went to Billings and was there on April 11, 1911, intending to agree with the receivers upon a price for the securities, then return to Butte where his associates were located, secure the money, go back to Billings, and make the purchase. He was successful in agreeing with the receivers upon a purchase price of $78,506.31 (which was twenty-five per cent of the face value of the securities), but was informed by them that this amount must be paid and the deal closed by 12:30 of that day or the deal would be off. This peremptory announcement was made to the plaintiff at about 10 o'clock, and the interval of two and one-half hours to elapse before the payment was required to be made was not sufficient to allow him to get in touch with his associates and secure their proportionate contributions to the purchase price; so he paid the whole amount himself, the securities were assigned and delivered to him personally, and on the same day he took them with him to his home in Helena. Plaintiff testified that on the following morning he called the defendant by telephone, advised him of the Billings transaction, and asked him to get in touch with Wall and Lane and send to him their proportionate part of the purchase price, but that the defendant failed to do this; also, that a few days later he (plaintiff) went to Butte to see the defendant to try to get him to put up his share of the purchase price. Plaintiff further testified that he repeatedly demanded of the defendant that he contribute his share of the purchase price, but that he never paid any portion of it, and finally, along in the summer of 1912, he (plaintiff) notified the defendant that he was "out of" the Billings deal.

The defendant in his testimony denied that the plaintiff had ever asked him to contribute anything toward payment for these securities, and there is some intimation in his testimony to the effect that there was another, separate, and independent agreement between him and the plaintiff, by which the plaintiff was to purchase the securities and that one-fourth of the profits, if any, derived from their sale should pass to the de-

fendant in consideration of certain services to be rendered by him in seeking to make a market for them. While this was denied by the plaintiff, we do not think it is material for our present consideration.

This transaction was, in either case, a joint adventure, and we agree with the contention of counsel for defendant that the plaintiff's relation to the property acquired, as between himself and his coadventurers, was that of trustee of an express trust. (*Botsford* v. *Van Riper*, 33 Nev. 156, 110 Pac. 705.)

For some years prior to the month of October, 1912, the plaintiff and defendant had been engaged in business transactions other than the one here involved, and the plaintiff claimed that there was a balance due to him in connection with them, and about October 4, 1912, presented to defendant a statement showing a balance of $15,739.25 due from him and demanded settlement. The parties had a long discussion over this statement of account, and other matters, including the Billings securities, in the Silver Bow National Bank at Butte, and finally defendant agreed to send plaintiff a note for the amount of his claim prior to November 1 following. In accordance with this agreement, he did send plaintiff a note for the amount in a letter dated October 31. The note sent was not satisfactory to the plaintiff, and about November 6 or 7 he went to Butte again, and had an interview with the defendant, as a result of which he gave the plaintiff the note set out in the plaintiff's complaint as the basis of his cause of action.

In reference to the discussion between the plaintiff and defendant at the meeting in the Silver Bow National Bank which resulted in giving the first promissory note, for which the note mentioned in the complaint was substituted early in November, the plaintiff testified: ''There was a discussion on what is known as the Billings deal. He said 'A. B., you ought to let me in on the Billings deal.' 'Well now,' I said, 'we settled that long ago. I told you to put up or you were out.' * * * And I said, 'I am telling you now and forever that

you are not in on that deal; you were counted out long ago when you didn't put up.' '' This was on October 5, 1912. On November 6 or 7 following, when the substituted note was given, there was a further discussion of the matter, concerning which the plaintiff testified: ''He mentioned the Billings matter again to me in November when he gave me the promissory note, and I said, 'I told you before that you were not in on the Billings deal; that you were counted out long ago.' '' Speaking of the controversy as to the amount for which the note was given, the plaintiff further said: ''We agreed to this amount. He had other things that he wanted to bring in I wouldn't stand for. He wanted an allowance, to know if I was not going to allow him anything on the Billings bonds, and I told him, no, that he was out.''

While the defendant in his testimony stated that the plaintiff had never asked him to contribute anything toward payment for the Billings securities, he did not deny that the plaintiff had made the above statements to him, and in the interval between the two conversations above recited, on October 31, 1912, wrote a letter to the plaintiff, inclosing the first note in which he said: ''I still think the same as I last told you about my being in on the Billings telephone bonds, but we will talk this whole matter over later.''

The defendant testified that in the second discussion above referred to, he and the plaintiff talked about the affairs mentioned in the letter of October 31, and ''rehashed'' what had been talked about when the first note was given.

From the time of the discussion between these parties in November, 1912, down to the date of the filing of the defendant's answer in this case on December 14, 1921, the subject of the Billings securities was never mentioned between the plaintiff and defendant except on one occasion, the date of which is left uncertain, although it is clear that it was in the latter part of 1912 and after the note above-mentioned had been given, when Lane, the defendant, and the plaintiff, met at a hotel in Chicago. Referring to what took place at the

time, Lane testified: "Substantially, Mr. Cook said to Mr. MacGinniss, 'You haven't put up and you are out of it.'" Lane said this conversation took place in the elevator at the La Salle Hotel. Plaintiff says the conversation took place as the three were riding down in the elevator at the La Salle Hotel, that MacGinniss was offering some suggestions as to the method of handling the Billings securities, when "I told him I didn't want any advice from him as to how to handle these securities; that it was none of his * * * business what I did with these securities; that he wasn't in it and I didn't care for any of his advice." MacGinniss testified that the conversation took place at an earlier date and in the rotunda of the Congress Hotel; that he was offering some suggestions, when Cook stopped him and said, "Now, I am handling that deal, and when I want any advice from you I will ask for it," to which, according to his recollection, he replied, ".So be it; go on."

From the foregoing testimony it must be accepted as a fact that plaintiff during the summer and fall of 1912, and particularly on October 5 and November 6 or 7 of that year, declared to the defendant that he no longer had any interest in the Billings securities; that he was out of that deal forever and was not to be recognized or considered in connection with it; and that the plaintiff thereafter held and treated the Billings securities as his own property, and thereby the defendant was placed in a position where he could at once have instituted an action against the plaintiff for the purpose of having his rights, if any, in these securities ascertained and decreed. This conclusion is sustained not alone by the undenied statements of the plaintiff above referred to, but is borne out by the whole record.

At the time these Billings securities were purchased, their value was highly speculative. Lane testified: "Intrinsically those securities at that time were of probably small value; I would say they might be classed as a very long gamble"; and the defendant testified that they were "hazardous."

The Interstate Telephone Company, in which these four men were interested as stockholders, was a holding company having the stock control of the two Billings companies whose bonds and notes are here involved, and also of other independent telephone companies in Montana and elsewhere. During the time the Billings securities were held by plaintiff, the defendant entered into an agreement with a subsidiary of the American Telephone & Telegraph Company to sell to it a controlling interest in the stock of the Interstate Company for a consideration of $1,400,000, the effect of which deal, if consummated, would greatly enhance the value of the bonds and notes of the independent companies whose stock was held by the Interstate Company. The defendant said they all knew that if he ever got this deal through the Billings securities would be good. He was successful in his deal, and about February, 1913, delivered the control of the stock of the Interstate Telephone Company according to his contract. It thus appears by his own statement that defendant knew the Billings securities were made good as early as February, 1913.

The note of October, 1912, was not paid at maturity. Thereafter the plaintiff made continuous and earnest efforts to collect it, both by personal interviews and correspondence. The four payments totaling $10,000 made during the years of 1916, 1917 and 1918, were only made after frequent demands and threats of suit. There are in the record upwards of twenty letters and telegrams which passed between these parties during the years 1917 to 1920, inclusive, in which the plaintiff repeatedly demanded payment of the note and the defendant as often asked for extensions of time for its payment.

The following extracts from this correspondence leading up to the $1,250 payment on the note made April 22, 1918, are typical of the rest: Under date of March 25, 1918, the plaintiff wrote defendant a letter in which he said: "My Dear John: You are certainly the limit. You are certainly past master at standing things off. This matter has been going on for years

and I am getting thoroughly disgusted. I want this matter cleaned up and I want it done this week.'' No answer to this letter appears in the record, and on April 12, 1918, plaintiff wired defendant: ''Wire quick how much and when you can make payment on note. Important.'' To which the defendant answered on the same day: ''Same amount as last as soon as party wall matter adjusted. \* \* \* Meantime may get results by wire. Would one-half last payment help any next week?'' Again on April 21, 1918, plaintiff wired to defendant: ''If possible deposit Chase National Bank to the credit Merchants National Bank, St. Paul, my credit $1,250 partial payment on note. Have same wired.'' To this the defendant answered: ''Have wired money as requested your telegram 21st.'' And on April 22, 1918, plaintiff wrote the defendant: ''Dear John: Your wire just received stating you had placed $1,250 to my credit as per my telegram. I have credited same on your note and wish to thank you for same.''

During the period of time from the late fall of 1912 down to the filing of his answer in this case on December 14, 1921, knowing that the Billings securities had been made good by his own deal with the telephone stock in 1913 (and having knowledge at least as early as December, 1918, that the plaintiff had sold them at a large profit), and in face of the plaintiff's continued demands for payment of the note and his frequent entreaties for extension of time and promises to pay, the defendant never mentioned the Billings securities or made any claim that any portion of the proceeds or profits from their sale should be applied to the liquidation of his note.

The record shows that defendant is a man of wide and varied experience in financial affairs. With all the knowledge which he possessed of this transaction, it is not possible to arrive at any conclusion other than that if the defendant had not accepted and acquiesced in the plaintiff's repudiation of his interest in the Billings securities, he would have made some claim in respect to them during the nearly nine years in which he was being pressed for payment of his note.

Upon the foregoing record we hold that there was no issue to be submitted to the jury as to when the statute of limitations began to run against the cause of action set out in the second counterclaim.

But even so, it is contended by defendant that the running [7] of the statute was tolled by reason of the absences of plaintiff from the state of Montana between November, 1912, and the time of the filing of the answer on December 14, 1921. Section 9048, Revised Codes of 1921, provides that if after a cause of action accrues against a person "he departs from the state, the time of his absence is not part of the time limited for the commencement of the action." Plaintiff had been a resident of Montana for the last forty-one years. For the past fifteen years he had been engaged in ranching and stock-growing in this state. At the same time he was also engaged in business as a railroad contractor, and this frequently took him away from Montana for somewhat protracted periods of time. However, the defendant called the plaintiff as a witness at the trial, and he was interrogated at length as to his whereabouts during the years 1913 to 1921, inclusive, and he testified: "I was in Montana at least six months in 1913; in 1914, at least five months; in 1915, at least five months; in 1916, at least five months; in 1917, at least five months; 1918, at least ten months; 1919, at least ten months; 1920, at least ten months; and, 1921, at least ten months." There was no testi- [8] mony as to the plaintiff's whereabouts during these years, except his own. According to this, he was in Montana at least sixty-six months during that period. Notwithstanding the fact that this testimony was elicited from plaintiff, he was defendant's witness when he gave it and the defendant was bound thereby. (*Tebay Land & Livestock Co.* v. *Hastie,* 64 Mont. 509, 210 Pac. 605.) And although the testimony was brought out upon cross-examination, he was still the defendant's witness and his testimony was a part of the defendant's case. (*Wilson* v. *Harris,* 21 Mont. 374, 54 Pac. 46.)

It thus appearing from the undisputed testimony that the statute of limitations began to run upon the cause of action set out in the second counterclaim, as early as November, 1912, and that plaintiff was within the state of Montana more than five years between that date and the time of filing his answer, the defendant's right of action thereon was barred under the provisions of subdivision 1 of section 9030, Revised Codes of 1921 (*Stoudt* v. *Hanson*, 62 Mont. 422, 205 Pac. 253), and plaintiff's motion for a directed verdict upon this counterclaim should have been sustained.

Since the plaintiff's first assignment of error is well grounded, it is unnecessary to consider any of the other assignments; and likewise unnecessary to consider any of the defendant's cross-assignments of error which have relation to the trial of the issues on the second counterclaim.

The cause is remanded to the district court, with directions to dismiss the defendant's second counterclaim, and to enter a judgment therein in favor of the plaintiff and against the defendant for the sum of $21,088.89 (the amount found to be due upon the note set out in plaintiff's complaint on July 11, 1924), with interest on said amount from July 11, 1924, to the date of entry of the judgment hereby directed, together with plaintiff's costs.

The plaintiff will recover from defendant his costs on this appeal.

*Remanded with directions.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY and MATTHEWS concur.

MR. JUSTICE GALEN, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.

Petition for modification of opinion denied February 21, 1925.