No. 01-464

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 239

INQUIRY CONCERNING COMPLAINTS OF:

SAMUEL L. HARRIS and TROY NELSON DYE,

Complainants,

v.

MICHAEL S. SMARTT, Justice of the Peace,

Respondent.

FILED

OCT 2 5 2002

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

ORIGINAL PROCEEDING

COUNSEL OF RECORD:

For Complainants:

Gregory G. Gould, Special Counsel for the Judicial Standards Commission, Luxan and Murfitt, PLLP, Helena, Montana

For Respondent:

Channing J. Hartelius, Hartelius, Ferguson, Baker and Kazda, Great Falls, Montana

Michael S. Smartt, Great Falls, Montana

Submitted: March 6, 2002

Decided: October 25, 2002

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    The Judicial Standards Commission (the Commission) has filed a formal Opinion and Recommendation in this Court following a hearing on allegations made against Cascade County Justice of the Peace Michael S. Smartt by Cascade County Justice of the Peace Sam Harris and Troy Nelson Dye. The Commission has recommended that Smartt be removed from office. Smartt has filed exceptions to the proceedings before the Commission in which he raises 39 objections. We substantially agree with the findings of the Commission and suspend Smartt without pay through the end of his term, December 31, 2002.

¶2    We consolidate Smartt's objections as follows:

¶3    1.    Did the Commission commit any prejudicial error which requires reversal or dismissal of the proceedings or the complaints?

¶4    2.    Were the Commission proceedings conducted in violation of the confidentiality provisions of Montana law?

¶5    3.    Did the Commission err in denying Smartt's motion to disqualify Chairman Warner?

¶6    4.    Did the Commission err in denying Smartt's motions for continuance?

¶7    5.    Did the Commission err in denying Smartt's motion to suppress evidence?

¶8    6.    Did Smartt's conduct violate the Canons of Judicial Ethics?

¶9    7.    What appropriate sanction should this Court impose?

¶10   8.    Should Smartt be assessed and ordered to pay the costs of this proceeding?

2

## Facts and Procedural Background

¶11 The Cascade County Justice Court has two Justices, denominated as Departments 1 and 2. Michael Smartt was sworn in as Justice of the Peace (JP) for Department 1 in January 1999. Samuel B. Harris took office as Justice of the Peace for Department 2 in June 1999. The court, although separated into two departments, operates on a single budget and a single filing system. Office staff work for both departments and are not separately assigned. The two JPs share supervisory responsibilities over the Justice Court office staff.

¶12 The Justice Court office includes a general office area where the office clerks and manager generally work. The two JPs each have separate enclosed chambers within the general office area. The entire Justice Court office area has an outer door that is locked to restrict access to the general public. All office staff, the two JPs and the custodial staff have keys to the main Justice Court offices. Justice Court office staff routinely and frequently go in and out of both JPs' chambers daily to locate files, put files in slots for upcoming trials, update calendars and ask questions.

¶13 For purposes of performing judicial duties, each JP was provided with a desktop computer used in chambers and a laptop computer. These were paid for by Cascade County and the State of Montana at public expense. The JPs were provided internet access on their computers, also at county expense.

¶14 The desktop computers used by the JPs and office clerks for word processing and calendaring were joined together on a network. The passwords on the JPs' computers were

3

"Judge 1" and "Judge 2" respectively, and the passwords for each were known to the other JP and to some of the office staff.

¶15 Susan Stevenson has been employed by the Cascade County Justice Court for 22 years and has been the office manager for at least ten years. Her duties include shutting down the office at the end of each working day, including checking that computer monitors are shut off daily and shutting down the entire system at the end of the day on Fridays.

¶16 Staff were not required to obtain permission to enter the JPs' chambers, unless there was someone in chambers with the judge. Stevenson testified that she occasionally entered Smartt's office and opened his desk drawer to put in money from weddings, whether or not Smartt was present. Additionally, she would occasionally answer the phone when she was in Smartt's chambers and access the calendar on Smartt's computer to provide information to the caller. At times Smartt would call Stevenson and ask her to look for something on his desk. County computer support staff also entered the Jps' chambers to perform computer support.

¶17 On Friday, October 13, 2000, Stevenson mentioned to Harris that she was having difficulty with the automated backup system on the network. She indicated that staff members often leave programs open on their computers, which cause the backup program to fail. She also told Harris that a staff person in the computer support department had told her that Judge Smartt's computer must have been in one of the programs on a previous occasion when the backup program failed. She requested Harris's help in shutting down

Smartt's computer so she would not delete any open documents. Smartt had left earlier in the afternoon.

¶18 Stevenson and Harris entered Smartt's chambers and went around his desk to check his computer terminal. The terminal screen was darkened in the "energy save" mode. Stevenson touched the mouse to reactivate the screen and clicked on the toolbar. At that point, three pornographic pictures came up on the screen. Two of the pictures showed individual men masturbating and the third picture showed two men engaged in oral sex. Stevenson said, "Oh my God," and ran from the office. Harris testified that it was clear from the box surrounding the pictures that they came from an internet website. Harris printed the screen to record what he and Stevenson had seen, and then he hit the power button on the computer and shut it off.

¶19 Harris returned to Smartt's chambers on the following Sunday and accessed the short term history file in the Internet Explorer program on Smartt's computer. He found and recorded twenty days of website activity, including approximately 105 websites that appeared to be "quite obviously pornographic."

¶20 Throughout the next few days, Harris returned to Smartt's chambers and monitored any new internet activity. At some point during this time, Harris took digital photographs of the temporary internet files on Smartt's computer which recorded website access beginning in August 2000.

¶21 Subsequently, Harris filed a sexual harassment complaint against Smartt with Cascade County and a complaint with the Judicial Standards Commission. Additionally, Harris made a report to the FBI because the names of some of the websites accessed on Smartt's computer indicated that they were meant to portray child pornography. The FBI obtained a search warrant and seized Smartt's desktop computer and his laptop computer. The FBI found that the two computers contained in excess of 18,000 pornographic images or files. The images found did not contain child pornography, although an FBI agent stated that they "pushed the limit."

¶22 Smartt admits using the county internet service and his county computer to access sexually explicit material on the internet. He testified that his access of this material was related to a joke birthday card he was planning for his wife's upcoming 50th birthday. He told the FBI investigator that he had about thirty to forty pornographic picture files on his desktop computer.

¶23 Upon receiving Harris's complaint, the Judicial Standards Commission sent a copy of the complaint to Smartt. The Commission received Smartt's response in November 2000 and directed the Honorable John Warner, chairman of the Commission, to pursue an informal resolution of the complaint. Sometime in late November, Warner became aware of a Montana Department of Justice Criminal Investigation Bureau (CIB) investigation of Smartt. He thought the investigation may be related to the Harris complaint and applied to the First

Judicial District Court for release of the CIB file. The court ordered release of the file and the Commission received the file on December 4, 2000.

¶24 Upon review of the file, Warner discovered that the investigation did not concern the Harris complaint, but rather concerned a factual allegation of criminal conduct made by Troy Dye against Smartt. Dye testified that he met Smartt on the street in Sydney, Montana, sometime in early May 2000. Smartt introduced himself to Dye and said he was a Cascade County JP or judge and that he was in town for a conference. Dye responded that "maybe I shouldn't be talking to [you] because I had some trouble with the law." Smartt then invited Dye to come back to his motel room and have a drink and discuss Dye's legal problems. Smartt told Dye that he "wasn't a cop, he couldn't arrest me."

¶25 Smartt and Dye went to Smartt's room and had two or three drinks each. They discussed general things and also talked about outstanding warrants on Dye. Smartt testified that he told Dye, "You know you're going to be arrested if you attract attention so why don't you just keep your nose clean and behave." Smartt also testified that Dye told him he was fixing up a house in Sydney. Because Smartt is also interested in building, he and Dye walked from the motel to Dye's house. Dye testified at the hearing that he and Smartt smoked marijuana while at Dye's house, but Smartt testified that they only went there to see the house and did not stay long. He emphatically denied smoking marijuana with Dye.

¶26 When they left Dye's house, they walked to the Ranger Bar to have dinner. Dye testified that while eating, Smartt asked him if he would "like to go to his room and take a

7

shower with him." The statement shocked Dye and he got up and left. Smartt testified that he never asked Dye to take a shower with him, but instead, Dye told him at the bar that he had no running water in his house and he really needed a shower. Smartt replied that Dye could have taken a shower earlier when they were at Smartt's motel room. Smartt testified that Dye was "getting toasted," and he inexplicably got up and left.

¶27 According to Smartt's version of events, after Dye disappeared, Smartt went and checked the bathroom to see if Dye was alright. He could not find Dye anywhere in the bar, so he paid the bill. Dye had left $5 and a pair of gloves sitting next to his plate. Because he was worried that something had happened to Dye because he was so drunk, and also to return Dye's gloves, Smartt walked back to Dye's house. The door was not locked, so he opened it and saw that Dye had fallen off the couch in a very awkward position. When Smartt walked into the room to put the gloves on the couch, Dye woke up and staggered backwards. At that point, Dye said something to Smartt about taking a shower in his motel room and they left together. About halfway back to the motel, Dye just walked across the street and started talking to a man. Smartt testified that he was glad Dye left because he really needed to go to bed.

¶28 Dye, on the other hand, testified that he left the bar after Smartt's strange comment and went home and went to sleep on the couch. Some time later, he woke up when "somebody had grabbed me . . . by the balls and picked me up by my crotch . . . ." Once awake, he recognized Smartt. Smartt grabbed Dye by the arm and said, "Let's go in here,"

8

leading Dye to the bedroom. Dye responded, "No," and went out the front door. Dye testified that he did not know what to do. He thought about hitting Smartt, but he did not think anyone would believe his version of the story over a judge's version. They started walking down the block, and Dye saw a young man. Dye asked him if he could walk with him and turned away from Smartt and walked back to his house.

¶29 Dye did not report this incident for several months. He had warrants outstanding and did not want to call attention to himself. When he was picked up for the warrants, he reported the incident to the judge and asked the judge how he could file a complaint against Smartt.

¶30 Commission Chairman Warner advised Smartt of the Dye allegations in a letter dated December 27, 2000. On December 30, 2000, Warner met informally with Smartt and his attorneys. A court reporter was present, and a transcript of the meeting was prepared and filed in the Commission office. Smartt requested, and received, a copy of the transcript.

¶31 After the meeting, Warner forwarded a copy of the entire CIB file to Smartt and Smartt responded to Dye's allegations on January 28, 2001. The Commission then retained Gregory Gould as prosecuting attorney and directed him to file a formal complaint. Gould informed Smartt that if he resigned his position, a formal complaint would not be filed. Smartt notified Gould and the Cascade County Commissioners that he intended to resign from his position as Justice of the Peace effective July 1, 2001. On July 2, 2001, Smartt

withdrew his resignation. Gould then filed the Commission's formal complaint with the Clerk of the Supreme Court.

¶32 Smartt petitioned the First Judicial District Court for a writ of prohibition, which was issued on July 20, 2001. The writ barred the Commission from further proceedings against Smartt based on an unverified complaint until further order from the court.

¶33 The Commission moved to vacate the writ. Following oral argument, the court entered an order modifying the writ. The order allowed the Commission to proceed on the basis of verified complaints alleging matters within the jurisdiction of the Commission. Smartt appealed the District Court's modification and we affirmed. *State ex rel. Smartt v. Judicial Standards Commission*, 2002 MT 148, 310 Mont. 295, 50 P.3d 150 (*Smartt I*).

¶34 A hearing was held before the Judicial Standards Commission on the formal complaint and the Commission subsequently filed its Opinion and Recommendations with this Court. Smartt filed a brief, raising 39 objections to the Commission's proceedings. Gould, as the prosecuting attorney, filed a response.

*Standard of Review*

¶35 Section 3-1-1107, MCA, states:

Action by supreme court. (1) The supreme court shall review the record of the [Commission] proceedings and shall make such determination as it finds just and proper and may:
(a) order censure, suspension, removal, or retirement of a judicial officer; or
(b) wholly reject the recommendation.

10

¶36    Accordingly, we review the Commission's proceedings *de novo*. The Commission's recommendations are not binding on this Court. We consider the evidence and then exercise independent judgment.

*Issue One*

¶37    Did the Commission commit any prejudicial error which requires reversal or dismissal of the proceedings or the complaints?

¶38    Smartt raises several objections to the procedure followed by the Commission in this case and argues that, in the aggregate, these errors are so egregious that the proceedings against him should be dismissed. A majority of these objections were raised in Smartt's earlier appeal concerning the dismissal of the writ of prohibition and have been disposed of in this Court's opinion in that case. *Smartt I.* After consideration, we conclude that the remaining procedural objections are meritless and we decline to address them.[1]

*Issue Two*

¶39    Were the Commission proceedings conducted in violation of the confidentiality provisions of Montana law?

---

[1] These included objections that the commission members wore judicial robes at the hearing; that statements in Warner's letter were "inappropriate and beneath the ethical standards that we should expect of the Commission;" that the use of Supreme Court facilities for the Commission proceedings raised the possibility of the Supreme Court indirectly influencing the proceedings; that the Commission's appointment of Warner to handle procedural matters cited a non-existent rule number; that Dye's complaint was not on the correct form and did specify which Canons Smartt allegedly violated; that the Notice of the Formal Complaint was signed by Warner and not by "the Commission;" that the denial of the opportunity to give closing arguments at the formal hearing equated to a denial of effective assistance of counsel; and that certain statements by Warner at the hearing were "grossly irregular" and "highly prejudicial."

11

¶40   Article VII, Section 11 of the Montana Constitution states that the proceedings of the Commission are confidential "except as provided by statute." Section 3-1-1105, MCA, states that "Except as provided in 3-1-1107 and 3-1-1121 through 3-1-1126, all papers filed with and proceedings before the commission or masters are confidential and the filing of papers with and the testimony given before the commission or masters is privileged communication."

¶41   However, if the Commission finds good cause to order a hearing in a matter, the Commission must allow public access to all the papers relating to each finding of good cause and to the proceeding and the records of the proceedings. Section 3-1-1121, MCA. Any hearing conducted before the Supreme Court relative to a recommendation by the Commission, together with all papers pertaining to such recommendation, shall be accessible to the public. Section 3-1-1107(2), MCA. A judge may waive confidentiality and request in writing that proceedings be accessible to the public. Section 3-1-1122, MCA.

¶42   Smartt argues that there is "inherent confusion if not direct conflict in the foregoing provisions regarding confidentiality." We disagree. The statutory provisions maintain confidentiality of Commission records until the filing of a formal complaint. After a formal complaint has been filed, certain papers, proceedings and records of proceedings become accessible to the public.

¶43   Confidentiality provisions are enacted to protect the reputation of innocent judges wrongfully accused of misconduct; maintain confidence in the judiciary by avoiding

12

premature disclosure of alleged misconduct; encourage retirement as an alternative to costly lengthy formal hearings and protect commission members from outside pressures. JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 13.15 (3rd ed. 2000). Montana's statutory framework balances these goals against the public's right to know, as guaranteed in Article II, Section 9 of the Montana Constitution. A complaint against a judicial officer is confidential until the Commission finds good cause to order a hearing. Once good cause is found and a formal complaint is filed, the legislature has determined that the public's right to know outweighs the individual judge's right to privacy.

¶44 Smartt also argues that the Commission unlawfully provided copies of the CIB investigation file to the Commission members and its prosecutor, "who in turn filed it as Exhibits [sic] within the formal hearing in this matter, which, as a result, makes the matter a public record."

¶45 Section 44-5-303, MCA, provides, in pertinent part:

(1) Except as provided in subsections (2) through (4), dissemination of confidential criminal justice information is restricted to criminal justice agencies, to those authorized by law to receive it, and to those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure.

. . . .

(3) Unless otherwise ordered by a court, a person or criminal justice agency that accepts confidential criminal justice information assumes equal responsibility for the security of the information with the originating agency. Whenever confidential criminal justice information is disseminated, it must be designated as confidential.

13

¶46 Smartt does not argue here that the Commission was not authorized to receive the files, only that it unlawfully made the files public by including them as an exhibit at the formal hearing. A review of the transcript reveals that the CIB file was not admitted into evidence during the hearing. At the beginning of the hearing, Gould stated that, "the prosecution had provided to the Respondent copies of premarked exhibits several weeks ago. There were quite a few exhibits. We won't be using all of those today . . ." Despite the fact that the CIB file was not admitted at the hearing, it is included in the bound volume of prosecution exhibits. Smartt did not object at the hearing to its inclusion with the admitted exhibits, therefore any argument he may have concerning breach of his privacy has been waived.

*Issue 3*

¶47 Did the Commission err in denying Smartt's motion to disqualify Chairman Warner?

¶48 Smartt filed a motion to disqualify Warner, alleging that Warner "overstepped the role of investigator in this Cause." In support of this allegation, Smartt relies on many of the procedural errors he has raised elsewhere, on Warner's request for the CIB file, on the fact that Warner instigated a meeting "under the guise of Commission Rule 10(g)," but ultimately for the purpose of gathering information against Smartt, and also on an allegation that Warner and Smartt engaged in a "heated debate" at a meeting of the judiciary in Polson, Montana.

14

¶49 Four members of the Commission considered the motion to disqualify and found that Warner did not attend a judicial conference in Polson. The Commission members also reviewed the written records and transcripts of Warner's contact with Smartt and concluded that Warner showed no bias or prejudice in his dealings with Smartt.

¶50 In *Smartt I*, we disposed of Smartt's procedural arguments and concluded that the Commission and by extension, Warner, did not exceed its jurisdiction in obtaining a copy of the CIB file. *Smartt I*, ¶ 30. A transcript of the meeting between Warner and Smartt, which Smartt alleges was a "fishing expedition," reveals that Warner informed Smartt that the basis of the meeting was to give the judge a chance to avoid publicity. At the meeting, Warner informed Smartt that the Commission was taking the two complaints seriously and that Smartt might want to consider the fact that a formal complaint becomes public. As noted earlier, one of the underlying purposes of the confidentiality provisions is to encourage retirement as an alternative to costly, lengthy, and public formal hearings. Warner in no way implied that he was biased or prejudiced against Smartt by imparting this information.[2]

¶51 Smartt does not raise any argument against the Commission's finding that Warner did not attend the meeting in Polson where Smartt alleges his "heated debate" with Warner took place. Thus, this basis for disqualifying Warner has been waived.

---

[2] We note that the transcript of the meeting was not offered into evidence by either party at the hearing and, as such, remains part of the confidential Commission file. However, Judge Smartt has apparently waived his confidentiality with respect to this transcript by including a copy of it in the Appendix filed with his exceptions to the Commission proceedings.

15

¶52 After reviewing the complete record, we agree that Warner showed no bias or prejudice in his dealings with Smartt. We conclude that the Commission did not err in denying Smartt's motion to disqualify Warner.

*Issue 4*

¶53 Did the Commission err in denying Smartt's motions for continuance?

¶54 Smartt argues that the Commission should have granted a continuance of the Formal Hearing and that the failure to do so deprived him of a fair opportunity to defend the charges against him. He argues that there were dispositive motions pending in the District Court and that the prosecution's witness list, provided two weeks before trial, included 15 previously undisclosed witnesses.

¶55 Smartt was given written notice of the Harris complaint in October 2000. He received the complete CIB file on the Dye complaint in early January 2001. He received a draft of the formal complaint in May 2001. The scheduling conference was held on July 11, 2001. The writ of prohibition was lifted on August 15, 2001.

¶56 The prosecution gave its witness list to Smartt within the time limit set at the scheduling conference. Although Smartt argues that 15 witnesses listed were previously unknown to him, he does not specify who those witnesses were and the prosecution claims that the only witness who may not have been previously disclosed was their computer expert. The dispositive motion that was pending in District Court was, in fact, a motion for reconsideration of the court's August 28, 2001 order lifting the writ of prohibition. There is

16

nothing unusual about preparing for a hearing while dispositive motions are pending. If Smartt failed to do so, he cannot fault the Commission.

¶57    We conclude that the Commission did not err in denying Smartt's motions for continuance.

## Issue 5

¶58    Did the Commission err in denying Smartt's motion to suppress evidence?

¶59    At the outset, we restate the evidence that was obtained from each entry into Smartt's chambers. The first entry, when Harris and Stevenson entered Smartt's chambers to shut down his computer, yielded the pornographic images on the computer screen which Harris printed. The second entry yielded lists of websites Harris hand copied from the history file on Smartt's internet software. Further entries yielded digital photographs of the long term history of internet activity on Smartt's computer. Subsequently, the FBI confiscated and searched Smartt's computer. That search resulted in testimony concerning the number of images found on the hard drive of Smartt's desktop and laptop computers, as well as a characterization of those images. Because the FBI justified its search by information gathered from Harris's second and subsequent entries into Smartt's chambers, we will analyze the search issue at two levels.

¶60    The Commission determined that the evidence seized by Harris on his second and subsequent entries into Smartt's chambers was wrongfully obtained in violation of Smartt's federal and state constitutional rights. However, the Commission concluded that the

17

exclusionary rule did not apply to its proceedings because the proceedings are disciplinary in nature, not criminal. Therefore, the Commission considered all the evidence.

¶61 Smartt argues that all the evidence seized from the first and subsequent entries into his chambers violated his constitutional rights and should be suppressed. For support, he relies on this Court's opinion in *Gryczan v. State* (1997), 283 Mont. 433, 942 P.2d 112, concerning the elevated right of privacy under Montana's Constitution.

¶62 Gould argues that the Commission incorrectly ruled that an unlawful search occurred. He argues that (1) Smartt had no legitimate expectation of privacy as to matters received through the internet on his county-owned computer in his county-owned office; (2) that Harris had a duty as a supervisor of court employees to protect them from sexually explicit material; and (3) the doctrine of "inevitable discovery" legitimizes the search.

¶63 When analyzing search and seizure questions that specially implicate the right of privacy under Montana's Constitution, we consider Sections 10 and 11 of Article II of the Montana Constitution. *State v. Boyer*, 2002 MT 33, ¶19, 308 Mont. 276, ¶ 19, 42 P.3d 771, ¶ 19. These sections provide:

> Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
>
> Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

18

¶64 To determine the threshold question of whether there has been an unlawful government intrusion into one's privacy, this Court looks to the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the state's intrusion. *Boyer*, ¶ 20. Where no reasonable expectation of privacy exists, there is neither a "search" nor a "seizure" within the contemplation of Article II, Sections 10 and 11 of the Montana Constitution. *Boyer*, ¶ 20.

¶65 We have recognized that Montana's unique constitutional language affords citizens a greater right to privacy and therefore, broader protection than the Fourth Amendment in cases involving searches of, or seizures from, private property. *See Gryczan*, 283 Mont. at 448, 942 P.2d at 121; *State v. Bullock* (1995), 272 Mont. 361, 384, 901 P.2d 61, 75; *State v. Siegal* (1997), 281 Mont. 250, 263, 934 P.2d 176, 183 (overruled in part on other grounds); *State v. Scheetz* (1997), 286 Mont. 41, 45, 950 P.2d 722, 724. However, "even in Montana, when a person leaves the privacy of his home and exposes himself and his effects to the public and its independent powers of perception, it is clear that he cannot expect to preserve the same degree of privacy for himself or his affairs as he could expect at home." *Scheetz*, 286 Mont. at 49, 950 P.2d at 726.

¶66 In his brief, Smartt quotes several paragraphs from *Gryczan*, apparently arguing that because the image revealed on his computer implicates his "decision as to sexual matters," it qualifies for a heightened privacy protection. He states that he "has suffered the most

19

degrading and humiliating intrusion into a matter involving his private and intimate relationship with his wife." In his argument, Smartt likens pornography to homosexuality, in that both are practices not approved of by society in general. He argues that he has been persecuted as a result of society's sense of "super morality," and he likens the Commission proceedings to the Salem Witch Hunt. Smartt's argument is patently absurd.

¶67 In *Gryczan*, we stated that "consenting adults expect that neither the state nor their neighbors will be co-habitants of their bedrooms." 283 Mont. at 450, 942 P.2d at 122. In that case, plaintiffs were subjected to possible criminal penalties for personal choices that they exercised in the privacy of their homes. Had Smartt restricted his viewing of pornographic images to his bedroom, we would undoubtedly not be here today. However, to compare Smartt's choice of accessing sexually explicit material at work on his county-owned computer to the situation of the plaintiffs in *Gryczan* is to push legal analysis beyond credibility. The fact that the image revealed on Smartt's computer had sexual content does not influence the privacy analysis. In other words, just because something has sexual content does not mean it is private under the *Gryczan* decision or the Montana Constitution.

¶68 Harris and Stevenson first entered Smartt's chambers because of problems encountered with the network backup software. Stevenson requested Harris's assistance in shutting down Smartt's computer because she was not familiar with the programs the JPs operated and was afraid she would lose new data if she closed the programs incorrectly. This entry into Smartt's chambers was for a legitimate, work-related purpose. At that time, they

20

were not looking for evidence of misconduct, but were simply performing a standard office procedure: shutting down all the computers so the network could perform a back-up.

¶69 Irrespective of whether Smartt had any expectation of privacy with regard to the images on the computer screen, the nature of the intrusion did not rise to the level of a search. *Boyer*, ¶ 20. We conclude that Harris and Stevenson's noninvestigatory, work-related entry into Smartt's chambers did not constitute a search under the Fourth Amendment or Article II, Section 11 of the Montana Constitution. Consequently, we will consider the evidence derived from that entry.

¶70 Because, as discussed below, we conclude that this evidence alone supports the Commission's finding that Smartt violated the Canons of Judicial Ethics, we need not reach the question addressed by the dissent, that is whether Harris's subsequent entries into Smartt's chambers violated his constitutional rights to privacy and to be free from unreasonable searches and seizures.

*Issue 6*

¶71 Did Smartt's conduct violate the Canons of Judicial Ethics?

¶72 The Commission concluded that Smartt violated Canons 1, 4 and 34 of the Canons of Judicial Ethics. Those provisions state:

Canon 1: Relations of the Judiciary:

The assumption of the office of judge casts upon the incumbent duties in respect to his personal conduct which concern his relation to the state and its inhabitants, the litigants before him, the principles of law, the practitioners of law in his court, and the witnesses, jurors and attendants who aid him in the administration of its functions.

21

Canon 4: Avoidance of Impropriety:

A judge's official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach.

Canon 34: A Summary of Judicial Obligation:

In every particular his conduct should be above reproach. He should be conscientious, studious, thorough, courteous, patient, punctual, just, impartial, fearless of public clamor, regardless of public praise, and indifferent to private, political or partisan influences; he should administer justice according to law, and deal with his appointments as a public trust; he should not allow other affairs or his private interests to interfere with the prompt and proper performance of his judicial duties, nor should he administer the office for the purpose of advancing his personal ambitions or increasing his popularity.

¶73 The Commission concluded that Smartt "knowingly accessed sexually explicit images on a Cascade County computer and monitor. In this day of electronic communications, the Commission can find no distinction between this type of conduct and leaving a magazine with the same photo on the cover exposed to the office staff. . . . Stevenson, who was attempting to perform one of her managerial functions in turning off the computer on a Friday afternoon was exposed to the sexually explicit material without her consent."

¶74 To determine if Smartt's conduct violated these Canons, we rely on the following: Stevenson's testimony concerning the images that she saw; Harris's testimony concerning these same images; Dye's testimony; Judge Smartt's testimony concerning his access to pornographic websites, and his testimony concerning the Dye incident.

22

¶75 The charge that Smartt accessed sexually explicit images on his county-owned computer, and exposed Harris and Stevenson to these images, was proven by clear and convincing evidence. Smartt admitted in his testimony and in his press release that he had accessed such sites at work on his county-owned computer and admitted that his co-workers were exposed to pornographic images.

¶76 We agree with the Commission's conclusion that this conduct violated the Canons of Judicial Ethics.

¶77 Although the Commission found that there was no clear and convincing evidence that Smartt committed either a burglary or sexual assault against Dye, it concluded that "there is no question that Smartt was in the Dye residence uninvited." Smartt admitted that he invited Dye back to his motel room for a drink after Dye mentioned he had some legal problems. Smartt testified that his advice to Dye was "you know you're going to be arrested if you attract attention so why don't you just keep your nose clean and behave." It is clear to this Court that Smartt's admitted conduct with Dye was inappropriate and, at the very least, created an appearance of impropriety.

¶78 We conclude that Smartt's behavior in both incidents violated Canons 1, 4 and 34.

*Issue 7*

¶79 What is the appropriate sanction to be imposed by this Court?

¶80 Section 3-1-1107, MCA, states that this Court shall review the record of the Commission proceedings and "shall make such determination as it finds just and proper and may . . . order censure, suspension, removal or retirement of a judicial officer."

¶81 The focus of sanctions in judicial disciplinary proceedings is not to punish the individual judge, but to restore and maintain the dignity, honor, and impartiality of the judicial office, and to protect the public from further excesses. *See In re McCormick* (Iowa 2002), 639 N.W.2d 12, 16; *In re Stephenson* (N. C. 2001), 552 S.E.2d 137, 139. Courts in other states have outlined numerous criteria to apply in determining the appropriate sanction. *See In re Trudel* (Mich. 2002), 638 N.W.2d 405, 408; *In re Hammermaster* (Wash. 1999), 985 P.2d 924, 941-42; *In re Johnstone* (Alaska 2000), 2 P.3d 1226, 1237; *Office of Disciplinary Counsel v. Medley* (Ohio 2001), 756 N.E.2d 104, 107. These can be summed up as: a consideration of the duty violated, the respondent's mental state, the injury caused, and existence of mitigating or aggravating circumstances.

¶82 In this case, Smartt violated his duty to his co-workers and the duty to be free from impropriety and the appearance of impropriety. Although Smartt admits that he accessed sexually explicit websites at work on his county-owned computer and exposed his co-workers to pornographic images, he never acknowledges the impropriety of such conduct or the effect it has on the integrity and respect for the judiciary. Throughout his brief, Smartt attacks every conceivable aspect of the Commission proceedings in an effort to convince this Court that the Commission was on a witch hunt and has caused his family and him

24

immeasurable harm without good cause. We conclude that is simply not the case, and Smartt's failure to accept responsibility for his actions is almost as troubling as his initial misconduct.

¶83 Smartt's conduct has had a negative effect on the public's perception of the judiciary. His conduct has been the subject of considerable publicity and news coverage, including some initiated by Smartt himself. Rather than admit to any wrongdoing himself, Smartt has publicly criticized Harris's actions in this matter. Additionally, other than his claim that he was composing a joke birthday card for his wife, Smartt offers no evidence of mitigating factors. Even if true, that is no excuse for using public time and facilities to view pornography and to expose co-workers to such offensive pictures.

¶84 Applying the above criteria to this case, we determine that suspension is the appropriate sanction. Accordingly, Judge Smartt is hereby suspended from the performance of his judicial duties, without pay, from the date of this opinion through December 31, 2002.

*Issue 8*

¶85 Should Smartt be assessed and ordered to pay the costs of this proceeding?

¶86 The Commission unanimously requested that this Court order that Smartt be assessed and pay the costs of this proceeding. Rule 13(h) of the Rules of the Judicial Standards Commission states, in pertinent part, that:

> Should the commission find charges in a formal complaint to be true, and a recommendation for discipline as provided in Rule 9(c) be accepted and imposed by the supreme court, the responding judge may be assessed and

25

required to pay all costs of the proceedings before the commission, including reasonable attorneys fees of the prosecuting attorney.

¶87 It is therefore ordered that Smartt shall pay all the costs of the proceedings involving these matters. The Commission shall submit a statement to the Clerk of the Supreme Court of the total costs within 10 days from the date of this order. Smartt shall have 10 days from the date the statement is submitted in which to file any objections to the costs assessed against him. This Court will then enter a final order regarding the costs assessed against Smartt.

_____
Justice

We Concur:

_____
Chief Justice

_____


_____
Justices

_____
Honorable John W. Larson, District Judge,
sitting in place of Justice Patricia Cotter

26

Justice James C. Nelson specially concurs.

¶88 I concur in our Opinion as to Issues 1, 2, 3, 4, 5, and 8. As to Issues 6 and 7, I specially concur. I begin by addressing Issue 6.

¶89 While Smartt did not make this argument, I nonetheless have some concern about whether the present Montana Canons of Judicial Ethics (Canons) can serve as the basis for actual disciplinary action against any member of Montana's judiciary. Like Montana's former system for disciplining lawyers (*See Goldstein v. Commission on Practice*, 2000 MT 8, ¶ 61, 297 Mont. 493, ¶ 61, 995 P.2d 923, ¶ 61 (Nelson, J., dissenting)), Montana is the only state in the Union that subscribes to the antiquated Canons. There is a strong argument that these Canons are aspirational only; that they are neither prohibitory nor directive. And, for that reason, it is questionable whether the violation of one or more of these Canons can serve as the basis for actually disciplining a judge.

¶90 Basically, the problem is this: saying that a person "should" or "should not" do something arguably leaves the decision to engage in or to not engage in the referenced conduct up to the person. That is wholly different than actually requiring the person to act or to refrain from acting in a certain manner by use of terms such as "shall," "must," "shall not," or "must not." But, first some history.

¶91 Currently, Montana subscribes to the Canons as its "proper guide and reminder for judges." MONTANA CANONS OF JUDICIAL ETHICS, Preface. Although these Canons were adopted in Montana on May 1, 1963, the Canons themselves were originally written in 1908

27

and later adopted by the American Bar Association (ABA) in 1924. Walter P. Armstrong, Jr., *The (1972) Code of Judicial Conduct*, 26 Sw. L.J. 708, 708 (1972) (hereinafter Armstrong) (discussing history of the Model Code of Judicial Conduct). Other than the addition of Canon 35 in 1980 regarding improper publicizing of court proceedings, the Montana Canons themselves remain for the most part unchanged from their original version written almost a century ago. *See* Armstrong, at 708-10 (discussing amendments to the Canons made in the 1930's and 1950's).

¶92 By contrast, in the late 1960's there was a national movement to revise the 1924 Canons because those Canons failed to address a number of modern issues that frequently faced judges. For example, the Special Committee on Standards of Judicial Conduct appointed by the ABA in 1969 found that the Canons "dealt with inadequately or not at all . . . conflict of interest, financial reporting and public disclosure, and non-adjudicatory activities of judges such as law teaching and serving as officers or directors of business corporations." Armstrong, at 712-13 (quoting 95 A.B.A. REP. 1048 (1970)). After extensive discussion and input, the ABA unanimously adopted the Model Code of Judicial Conduct (Code) in 1972. Armstrong, at 715, 723.

¶93 The 1972 Code was again revised in 1990 with the addition of a Preamble, gender neutral language, and other changes intended to make the Code clearer. LISA L. MILORD, THE DEVELOPMENT OF THE ABA JUDICIAL CODE 7-8 (1992). Changes regarding judicial campaign conduct were made in 1997 and 1999. ABA MODEL CODE OF JUDICIAL CONDUCT,

28

8, 25 (2000) (hereinafter ABA MODEL CODE). Currently, 49 states have adopted either the 1972 Code or one of the versions of the 1990 Code. JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS, § 1.02 at 3-5 (3d ed. 2000) (hereinafter SHAMAN). Consequently, Montana is the only state that has failed to consider whether the 1924 Canons adequately provide both guidance to judges and notice to the public about what they can expect from judges.

¶94     As already noted, Smartt did not raise on appeal the issue of this Court's ability to enforce the Canons. That omission aside, I believe there are good reasons why this Court should consider adopting the modern Code.

¶95     First, there is the jurisdictional question mentioned above--i.e. under the present Canons, Montana judges are neither unambiguously required to nor prohibited from engaging in any referenced conduct. The wording of the 1924 Canons is entirely aspirational. No conduct is actually proscribed or required, and, therefore, no conduct or omission is punishable. As already mentioned, the preface to Montana's Canons states that they are simply a "proper *guide* and *reminder* for judges." (Emphasis added). The Canons at issue here--Nos. 1, 4 and 34, set out in full at ¶ 72, of our Opinion--follow the theme of "guiding" and "reminding" the judge.

¶96     For example, Canon 1 states that when a person becomes a judge he assumes various unspecified "duties" in respect to his personal conduct which concern his relations with various categories of persons. The Canon fails to state what "duties" the judge assumes and

29

neither requires nor prohibits any actual conduct in the performance of those duties.

¶97    Canons 4 and 34 speak in terms of conduct a judge "should" do or avoid. Again, by way of example, these Canons require that the judge's "everyday life" and "every particular [of] his conduct" . . . "should be" . . . "above [or] beyond reproach." This language begs the question: what is supposed to happen if the judge's "everyday life" is not "beyond reproach?" What if, for instance, the judge does a good job on the bench, but drinks too much, gambles, doesn't maintain his yard, openly swears at his neighbor's yapping dog, and humiliates his wife in public? Is his everyday life "beyond reproach?" Canon 34 specifies that the judge "should be" . . . "courteous, patient, [and] punctual." What if the judge isn't? Do the Canons require this sort of conduct to be punished for failure to comply?

¶98    In a more serious vein, what if the judge uses his office time and government-funded computer to view pornography? What if the judge is convicted of DUI? What if the judge habitually shoots from the hip, rules from the gut and ignores the law? What if the judge sits on the board of directors of a corporation that is "cooking its books?" Arguably these involve conduct that Canons 4 and 34 say the judge "should be free from" or "should avoid." But what if the judge does not? Where do the Canons actually *prohibit* this sort of conduct? Plainly, they do not.

¶99    A leading treatise on judicial ethics notes that some commentators believe the Canons were intended to be an ideal guide to behavior rather than an enforceable set of rules, while the Code is designed to be a mandatory and enforceable set of rules. SHAMAN, § 1.02 at 3.

30

¶100 For example, the 1924 Canons use the word "should," while the modern Code distinguishes conduct into three categories using "shall," "should" and "may." The Preamble to the Code specifically states that use of the word "shall" indicates *mandatory conduct the violation of which subjects a judge to possible discipline*; "should" is hortatory and is used for suggested conduct not subject to discipline; and "may" is used for discretionary conduct. Preamble, ABA MODEL CODE. The Code also notes that judicial disciplinary procedures should comport with the requirements of due process. Preamble, ABA MODEL CODE, n.1.

¶101 Our own jurisprudence bears out this distinction between mandatory terms and those that are merely discretionary. "Must" and "shall" are mandatory rather than permissive. *Montco v. Simonich* (1997), 285 Mont. 280, 287, 947 P.2d 1047, 1051 (citation omitted). "The word 'may' is commonly understood to be permissive or discretionary. . . . In contrast, 'shall' is understood to be compelling or mandatory." *Gaustad v. City of Columbus* (1994), 265 Mont. 379, 381-82, 877 P.2d 470, 471 (internal citations omitted). *See also* MONTANA LEGISLATIVE SERVICES DIVISION BILL DRAFTING MANUAL 2-5 (2002) ("Avoid using will, should, and ought. . . . Use 'shall' when imposing a duty on a person.")

¶102 This issue--whether the Canons are merely suggested guidelines rather than enforceable rules--was raised in a number of states before the modern Code was written. For example, in *Nix v. Standing Committee on Judicial Performance* (Okla. 1966), 422 P.2d 203, 207, the court stated, "[t]his Court adopted the Canons in the spirit in which they were suggested, that is, to serve as models of emulation, not as purported rules, laws or judicial

31

fiat." *See also In re Haggerty* (La. 1970), 241 So.2d 469, 474 ("The Canons of Judicial Ethics do not, of themselves, have the force and effect of law.").

¶103   In contrast, however, other states have held that the Canons are enforceable, just as the Rules of Professional Conduct are enforceable for lawyers. *Jenkins v. Oregon State Bar* (Or. 1965), 405 P.2d 525, 527 (rules of professional conduct, including judicial conduct, are binding upon judges; there would be no purpose in adopting "merely hortatory" Canons); *Mahoning County Bar Ass'n v. Franko* (Ohio 1958), 151 N.E.2d 17, 23 (Supreme Court has jurisdiction over the discipline of judge for acts committed in judicial capacity which are in violation of the Canons of Judicial Ethics). *See also In re Sheffield* (Ala. 1984), 465 So.2d 350, 355 (discussing the 1972 version of the Code that used the word "should" instead of "shall," holding that the "Canons are not merely guidelines for proper judicial conduct [but] . . . have the force and effect of law.").

¶104   In contravention to this latter line of authority, however, the Montana Rules of Professional Conduct (which govern the professional conduct of attorneys) *are* written in mandatory terms--a lawyer "shall" or "shall not" engage in certain specified conduct. There are exceptions, and those prove the general rule. For example, Rule 6.1, regarding *pro bono publico* service, is aspirational. This rule states that a lawyer "should" render a certain number of hours of legal services each year without expectation of a fee. Similarly, other Rules allow, but do not mandate conduct--a lawyer "may" do certain things. *See* Rules 6.3, 6.4, 7.2, and 7.4.

32

¶105  By adopting the modern Code, Montana would preempt any question of whether the Canons provide this Court with jurisdiction to discipline judges and whether the Canons are merely aspirational or are mandatory.

¶106  Second, the Canons are entirely composed in the masculine gender using "he," "his" or "him," while the current Code uses gender-neutral language.  Consequently, the Canons are in conflict with this Court's policy against gender discrimination and with the Montana Legislative Council policy to use gender-neutral language in bills.  MONTANA JUDICIAL BRANCH POLICIES AND PROCEDURES, Nondiscrimination Policy 200 (2002); In re State Bar of Montana's Gender Fairness Steering Committee, Oct. 21, 1999 (adopting Gender Fairness Task Force Final Report); MONTANA LEGISLATIVE SERVICES DIVISION BILL DRAFTING MANUAL 2-11 (2002).

¶107  Third, the modern Code is structured in a clear and understandable manner, while the 1924 Canons contain ambiguous and overly general provisions--the language of Canons 1, 4 and 34 cited in our Opinion being prime examples.  *See also Round Table Discussions on the Proposed Code of Judicial Conduct*, 9 SAN DIEGO L. REV. 785 (1972).

¶108  Fourth, the Code contains specific provisions for part-time judges which the Canons do not.  This is especially important in a state like Montana, which has numerous part-time judges serving in our courts of limited jurisdiction.

¶109  Fifth, the Code addresses modern issues that are not addressed in the Canons.  These issues include situations that are likely to face Montana's judiciary such as conflicts of

33

interest, financial reporting and public disclosure, and the non-adjudicatory business activities of judges.

¶110 Finally, by adopting the modern Code, both judges and the public will have the added guidance of the commentary that is included as part of the Code and the benefit of the interpretive case law from the 49 states that have adopted the Code.

¶111 It is worth noting that each time the subject of judicial conduct has been addressed on a national level, there was an instance of conduct that caused widespread concern among the public. In the early 1920's, federal Judge Kenesaw Mountain Landis engaged in private employment while receiving a government salary. Soon after his censure, the ABA adopted the Canons of Judicial Ethics. Armstrong, at 709. In the late 1960's, an unnamed federal judge, who later resigned, accepted a $20,000 payment from the family foundation of a financier who was a personal friend while that financier was under investigation for violation of federal securities laws. Subsequently, the ABA appointed the Special Committee on Standards of Judicial Conduct and later adopted the Model Code of Judicial Conduct. Armstrong, at 712.

¶112 Similarly, I suggest that Smartt's case has focused substantial public and professional scrutiny on the incident of judicial misconduct at issue here. Because of the matters discussed above and, of necessity, our application of the Canons to Smartt's actions, I believe that it is now time to question whether Montana's Canons of Judicial Ethics adequately provide the Judicial Standards Commission and this Court with an irrefutable source of jurisdiction for

34

disciplining judges; adequately provide clear and understandable rules of professional conduct for members of the judiciary; take into account modern issues that frequently face judges; and serve to maintain and enhance the public's confidence in an independent, fair, and competent judiciary. I suggest that, at best, the Canons provide weak, equivocal and antiquated answers to these questions. Therefore, I submit that the Court consider adopting the Code and that in doing so, we join all of our sister states in a common code of ethics for members of the judiciary.

¶113 Turning next to Issue 7, I agree that the sanction which we have imposed is appropriate. I do not agree with all that is stated in ¶ 81. Certainly one function of judicial disciplinary proceedings is "to restore and maintain the dignity, honor, and impartiality of the judicial office, and to protect the public from further excesses." Contrary to our Opinion, however, I believe that an important focus of judicial disciplinary proceedings *is* also to punish the individual judge.

¶114 In the context of our Canons being aspirational rather than prohibitory and directive, not focusing on punishment is, understandably, the best we can do with the rules we have. Adoption of the Code would solve this problem. That said, when a member of the judiciary engages in clear violations of the rules that govern his or her professional conduct and responsibility, he or she *should* be punished. We punish lawyers by censure, admonition, suspension or disbarment if they violate the Rules of Professional Conduct. Indeed, the Rules for Lawyer Disciplinary Enforcement (both the 2002 and pre-2002 versions) are

35

designed for that purpose--to investigate, prosecute and punish lawyers who violate the Rules of Professional Conduct. Why is it that judges should be treated differently? In my view, they should not be.

¶115  Moreover, in all of this we have seemingly missed the point that taxpayers do not furnish judges (or other public officials and employees, for that matter) with offices and equipment to facilitate their viewing of pornography. Furthermore, judges are not supposed to be advising known fugitives from justice to lay low and avoid attracting attention, a fact Smartt does not dispute. If anything, Smartt should have turned Dye into the authorities. Aside from being incredibly stupid, this sort of conduct is wrong by anyone's standards. A judge *should be* punished for behaving in this fashion. In fact, punishing the judge is probably the best way of restoring and maintaining the dignity, honor, and impartiality of the judicial office, and protecting the public from further excesses. At least the taxpayer will see that this sort of behavior will not be tolerated and members of the judiciary will see that individual judges who violate their rules of professional responsibility and conduct will bear an *appropriate sanction for their misdeeds.*

¶116  With the above, I concur in our Opinion.

Justice

36

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶117 I agree entirely with the Court's analysis of the legal issues before us and with its conclusion that Smartt violated Canons 1, 4, and 34 of the Canons of Judicial Ethics. I disagree with its determination that the appropriate sanction is suspension without pay through December 31, 2002, the end of his current term of office as a Cascade County Justice of the Peace. I would remove Smartt from office, effective immediately.

¶118 I recognize that, as a practical matter, there may be no real difference between suspension without pay through the end of Smartt's term and his removal from office. In my view, however, the Canons he violated go to the very heart of service as a member of the judiciary. As the Court observes:

> Smartt's conduct has had a negative effect on the public's perception of the judiciary. His conduct has been the subject of considerable publicity and news coverage, including some initiated by Smartt himself. Rather than admit to any wrongdoing himself, Smartt has publicly criticized Harris's actions in this matter. Additionally, other than his claim that he was composing a joke birthday card for his wife, Smartt offers no evidence of mitigating factors.

¶119 I would remove Smartt from office, as recommended by a majority of the members of the Judicial Standards Commission--indeed, all the nonjudicial members of that Commission. I share their view that suspension without pay is not enough to restore the public's faith and trust in the judiciary. As the majority recommending removal put it, Smartt "is not fit to sit on the bench or wear the honored robes of a judge." I agree, and I believe there is a qualitative difference between suspension without pay and removal from office

37

under the facts and circumstances of this case. This difference is unlikely to go unnoticed by the people of Montana.

_____
Chief Justice

District Judge John W. Larson, sitting for Justice Patricia O. Cotter, joins in the foregoing concurring in part and dissenting opinion of Chief Justice Gray.

_____
John W. Larson, District Judge

District Judge John W. Larson, sitting for Justice Patricia O. Cotter, specially concurring and dissenting.

¶120 I join in the Chief Justice's concurring opinion concerning violations of Judicial Canons 1, 4 and 34 and evidence obtained from Justice Smartt's Chambers, as well as in the Chief Justice's dissent on the sanction imposed by the majority. A court's credibility is linked with its accountability. We should send a strong message not only to judges but to all citizens that ethical behavior is a requirement of office. I also join in Justice Nelson's call for a new Code of Judicial Ethics, but for different reasons.

¶121 Montana's Constitution, Article VII, Section 11, grants the Judicial Standards Commission the exclusive power to screen, investigate and make findings and recommendations concerning ethical complaints against judges to the Supreme Court. This constitutional role and duty should not be overlooked. The Commission has also adopted rules concerning jurisdiction and grounds for discipline, e.g., Rule 9. Even if the style and drafting of the present Canons had been properly raised in this case, Commission Rule 9(3), willful misconduct in office, also would have supported the Commission's findings and recommendations.

¶122 The correct and careful application of the Canons and rules by the Commission has been something the people of this state have been able to rely on for almost 30 years. We all can feel confident that Montana's judicial branch is held to high ethical standards because of this independent Commission. Our citizens also have to be told the Commission operates

with a small staff, two, and volunteer members. The attorney for the Commission in this matter has been paid, but I suspect he could have made more from his day job.

¶123   As to the weakness of the Canon's mandates or the need to update them, the United States Supreme Court has recently required an entirely new vision of judicial rights and obligations under *Republican Party of Minnesota v. White* (2002), ____ U.S. ____, 122 S.Ct. 2528, 153 L.Ed.2d 694.

¶124   While it only makes sense to collaborate in the development of a new code of judicial ethics with the American Bar Association and American Judicature Society, I also urge the Court and drafters to recognize other issues, including the lack of clarity and need to recognize a more flexible role for judges in their community activities as noted by this recent Resolution passed on July 17, 2002, by the membership of the oldest and largest judicial membership organization -- the National Council of Juvenile and Family Court Judges -- at its 65th Annual Conference in Boston, Massachusetts:

Resolution In Support of the Modification of Canons of Judicial Ethics

Whereas, the National Council of Juvenile and Family Court Judges has a long established policy of encouraging the judiciary to engage in community outreach to foster the effective administration of justice; and

Whereas, the annual Conference of Chief Justices, at their Annual Meeting in August 2000, passed a resolution recognizing and encouraging judges to become involved in their communities to improve the quality of justice; and

Whereas, the role of juvenile and family court judges involves much more than fact-finding and adjudication; and

Whereas, judges are increasingly expected to take on the role of case

40

management, overseeing the successful implementation of comprehensive court-ordered service plans; and

Whereas, to serve the public effectively, judges must be aware of services in the community and must educate the public about issues coming before the courts to encourage community support of the work of juvenile and family court judges; and

Whereas, judges taking on such roles still experience conflicting response and confusion as to the propriety of their activities; and

Whereas, the Canons of Judicial Ethics vary from state to state and may not reflect the realities of being an effective juvenile and family court judge; and

Whereas, judges would benefit from a comprehensive set of appropriate guidelines and model rules, in efforts to bring about change and clarity regarding their roles as juvenile and family court judges both on and off the bench; and

Whereas, the National Council of Juvenile and Family Court Judges should take a leadership role in modifying canons of judicial ethics to assure that juvenile and family court judges can actively work toward the improvement of outcomes for children, individuals, and families who appear in our courts, without unreasonable fear of censure; and

Now Therefore, be it resolved that the Board of Trustees directs the development, in collaboration with other interested organizations, of a committee to draft specific canons for the affirmative ethical implementation of the aforementioned resolution;

Furthermore, that the proposed canons be presented to the National Council of Juvenile and Family Court Judges and Conference of Chief Justices for review and approval at their 2003 annual conferences, and other appropriate bodies as may be helpful in implementing these new canons.

John W. Larson, District Judge

41

Justice Terry N. Trieweiler dissenting.

¶125 I dissent from the majority's findings and conclusions that Justice of the Peace Michael S. Smartt violated Canons of Judicial Ethics and from the majority's decision to discipline Smartt by suspending him from his position without pay during the remainder of his term in office.

¶126 After all the pious outrage shown by everyone involved in this case, including Justice of the Peace Samuel Harris, the Judicial Standards Commission and the majority of this Court, the facts are that Michael S. Smartt is being removed from the position to which he was elected for conduct committed in private which had absolutely no effect on his job or anyone else. After all evidence which was illegally gathered is excluded, the incredible testimony of Troy Dye disregarded, and the Court's consideration limited to those allegations which were actually charged in the complaint filed against Smartt, Smartt has been removed from his position without pay because two co-workers discovered that he had viewed three sexually explicit photos on a county-owned computer, in the privacy of his office. The majority and concurring opinions demonstrate far greater concern for the majority's sense of good taste than for the constitutional right of privacy. The result in this case reflects more poorly on Smartt's accusers than on Smartt.

## CONDUCT OF SAMUEL HARRIS

¶127 With all the complaining that has gone on in recent years about judicial case loads, I assumed that members of the judiciary had better things to do than repeatedly and illegally sneak into another judge's office, pry into the hard drive of his computer, and when

42

something offensive to others is discovered, spend the resources we have spent investigating him, trying him, publicly humiliating him and his family and taking away the source of his livelihood. It would be different if Smartt was the one who had violated another co-worker's constitutional rights by invading his privacy, as Harris did, but Smartt 1) violated no laws; 2) violated no county policies; 3) did not intentionally impose his bad taste on anyone else; 4) was not found to have neglected his duties; and 5) was not shown to have cost his employer one extra cent because of his personal and private viewing habits.

¶128 Nevertheless, Smartt has been reported by Harris to the FBI, investigated by the Department of Justice, sexual harassment charges have been filed against him, he has had to defend himself before the Judicial Standards Commission, and he has now been suspended from his employment without pay. The resources that have been wasted following the inadvertent discovery of one sexually explicit computer screen is more befitting the Salem witch hunts than a busy judiciary with any sense of priorities. (The majority's protestations to the contrary notwithstanding.)

¶129 Cascade County Commissioner, Tom Stelling, testified that there had been a history of poor relations between Harris and Smartt prior to the events which have led to Smartt's discipline. My impression from a review of the entire record is that because of that poor relationship, Harris embarked on a personal crusade to destroy Smartt after viewing the sexually explicit photos which were so upsetting to him that he printed them, took them home with him, and then snuck back into Smartt's office repeatedly with a digital camera to see what else he could find. Am I missing something or has the wrong justice of the peace been

43

sanctioned? On a scale of disgusting and deplorable conduct, I would have to rank the gross and repeated invasion of Smartt's privacy by his co-worker far worse and, if unpunished, of greater consequence to society and the judiciary than anything that Smartt was actually found to have done.

¶130 If the public confidence in the judiciary is the Court's concern, it will be interesting to see what discipline is imposed on Harris who is actually responsible for the negative public perception the Court is so concerned about by invading Smartt's right to privacy in violation of the law and then using the fruits of his illegal search to advise the public that a fellow justice spent his private time in a manner that Harris knew would be offensive to large numbers of people.

## CONSTITUTIONAL ISSUES

¶131 One of the worst failures of the majority Opinion is its avoidance of the serious constitutional issues on appeal regarding a judge's, or any other public official's, right to privacy in his office and the content of his or her private communications or observations. I conclude that pursuant to Article II, Sections 10 and 11 of the Montana Constitution, Smartt did have a reasonable expectation of privacy in his office and in the contents of his computer; that Harris, as a public official, violated that right to privacy when he repeatedly and surreptitiously entered Smartt's chambers without a search warrant and without Smartt's permission; and, that all fruits of Harris's search should have been suppressed by the Judicial Standards Commission and disregarded by this Court.

44

¶132   The majority has correctly noted in ¶ 63 and ¶ 64 of its Opinion that whether there is an unlawful government intrusion into one's privacy depends on 1) whether the person has an actual expectation of privacy; 2) whether society is willing to recognize that expectation as objectively reasonable; and 3) the nature of the State's intrusion.  Here, Smartt testified that he had a personal expectation of privacy in not only his office but in the contents of the hard drive of his computer.  Although the computer system in his office was networked, other employees at the County did not have access to the information contained on his hard drive without entering his office, turning on his computer, entering his password, and performing the functions necessary to access that information.  Tom Stelling, the only county commissioner who testified, stated that he believed justice of the peace chambers were private and that the only appropriate way for a person other than the user of a computer to access information on the computer is to bring a problem to the attention of the county commissioners and then notify the user about the need to gain access.  There is no real dispute that the first element necessary for finding a right to privacy exists in this case.

¶133   I believe that society recognizes as reasonable the expectation of judges or other public officials to privacy in the contents of their office, including information stored on their computers.  The information found on the hard drive of Smartt's computer is no different than the contents of his desk drawers, his brief case, or sealed envelopes sitting on top of his desk.  His computer includes rough drafts of orders and sensitive search warrant information–the disclosure of which could cause harm to others.  No reasonable person would expect that a fellow employee could walk into Smartt's office, rifle through his desk drawers, open his

mail, or search his brief case. Why would they feel any differently about information stored on his computer hard drive? Not only would society be willing to recognize Smartt's expectation of privacy as reasonable, most members of the public would be shocked that Harris so cavalierly disregarded Smartt's expectation of privacy. It is ironic that while this Court discusses and votes on public issues privately and goes to great lengths to shred and conceal copies of proposed documents, it is not willing to extend the same degree of privacy to a justice of the peace. If this Court is as concerned as it indicates about erosion of public confidence in the judiciary, it does not have to look further than this apparent double standard for cause.

¶134 Finally, it is necessary to consider the nature of the State's intrusion. I agree that the initial efforts to shut down Smartt's computer which led to the inadvertent display of a screen depicting sexually explicit photographs was not a search and, therefore, not an intrusion which violated Smartt's right to privacy. However, Harris's conduct was something else. Although he feigned offense at the images that appeared unexpectedly, he took the time to print the images and take them home with him. He returned to the office the following day (a Sunday) and accessed the short term history file on Smartt's Internet Explorer and hand recorded all the web sites that had been visited within the previous twenty days. He returned to Smartt's office three to four times on the following Monday and three to four times on the following Tuesday. During those visits, he took digital photos of the web sites that had been visited by Smartt until he ran out of digital capacity. He did not have permission to enter Smartt's chambers. He did not ask for permission from the county commissioners. He did

not ask for the assistance of law enforcement officials. And, he was not protecting other employees because other than Stevenson's inadvertent discovery, no other employees had been affected by Smartt's use of his computer. Following these exhaustive efforts to discover what was on Smartt's computer, Harris filed a complaint alleging that Smartt sexually harassed him for having the material that Harris observed on his computer. Go figure.

¶135 Even Stevenson would not have been affected by Smartt's use of his computer had she not first activated the screen, made the necessary adjustment to exit Word Perfect, and then clicked on an icon on the tool bar which opened the program which displayed the sexually explicit photos. Contrary to the findings of the commission, her discovery was much different than had Smartt left an open magazine on his desk displaying sexually explicit material.

¶136 It doesn't matter that Smartt's computer was in a public office. The U.S. Supreme Court has held that workers may have a legitimate expectation of privacy in their offices or in parts of their offices such as their desks or file cabinets. *See O'Conner v. Ortego* (1987), 480 U.S. 709, 716-18, 107 S.Ct. 1492, 1497-98, 94 L.Ed.2d 714, 722-23. The Supreme Court did say in *O'Conner* that public employers have some latitude to enter the offices of employees for work-related, non-investigatory reasons. However, Harris was not Smartt's employer. Therefore, even if this Court was to consider the exception in Harris, when interpreting the greater protections provided for in Article II, Sections 10 and 11 of the Montana Constitution, the exception would be inapplicable. Furthermore, it is irrelevant that Harris was a justice of the peace rather than a police officer. The U.S. Supreme Court has

47

never limited the Fourth Amendment's protection to searches and seizures conducted by the police and neither should we when interpreting our own constitution. In *New Jersey v. T.L.O.* (1985), 469 U.S. 325, 336, 105 S.Ct. 733, 739, 83 L.Ed.2d 720, 730-31, the Court stated:

> It may well be true that the evil toward which the Fourth Amendment was primarily directed was the resurrection of the pre-Revolutionary practice of using general warrants or "writs of assistance" to authorize searches for contraband by officers of the Crown. See *United States v. Chadwick*, 433 U.S. 1, 7-8 (1977); *Boyd v. United States*, 116 U.S. 616, 624-629 (1886). But this Court has never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon "governmental action" – that is, "upon the activities of sovereign authority." *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities: building inspectors, see *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967), Occupational Safety and Health Act inspectors, see *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312-313 (1978), and even firemen entering privately owned premises to battle a fire, see *Michigan v. Tyler*, 436 U.S. 499, 506 (1978), are all subject to the restraints imposed by the Fourth Amendment. As we observed in *Camara v. Municipal Court, supra*, "[the] basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *387 U.S., at 528*. Because the individual's interest in privacy and personal security "suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards," *Marshall v. Barlow's, Inc., supra at 312-313*, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court, supra at 530*.

¶137 Finally, I would hold that evidence seized in violation of the Constitution cannot be used at disciplinary proceedings before the Judicial Standards Commission, the Supreme Court, the Commission on Practice or any other disciplinary agency which has the authority

to deny an individual his license to practice his profession or otherwise prohibit him or her from engaging in that profession. When confronted with the same issue, in *In re Langley* (Or. 1962), 370 P.2d 228, 230, the Oregon Supreme Court held that:

> [W]e hold that it would not be desirable for the Bar to employ in its disciplinary operations illegal tape recordings, evidence secured unlawfully by wire-tapping, or other fruits of criminal eavesdropping. We recognize that the rules of evidence in disciplinary cases are more flexible than they are in criminal prosecutions. However, to permit the Bar to use illegal tape recordings would be inconsistent with the public policy expressed by *ORS 165.540.*

¶138   At least one California decision applies the exclusionary rule to forfeiture proceedings which are civil in nature. In *Elder v. Board of Medical Examiners of the State of California* (Ct.App., 1st App.Dist., 1966), 241 Cal.App.2d 246, 260, 50 Cal.Rptr. 304, 315, the Court of Appeals held that:

> Whatever the label which may be attached to the proceeding, it is apparent that the purpose of the forfeiture is deterrent in nature and that there is a close identity to the aims and objectives of criminal law enforcement. On policy the same exclusionary rules should apply to improper state conduct whether the proceeding contemplates the deprivation of one's liberty or property. [Citations omitted.]

¶139   Likewise, admitting illegally gathered evidence at a disciplinary proceeding is inconsistent with the public policy for the exclusionary rule. The purpose of the exclusionary rule is to deter the violation of constitutional rights. *See Elkins v. U.S.*, (1960), 364 U.S. 206, 217-24, 80 S.Ct. 1437, 1444-47, 4 L.Ed.2d 1669, 1677-80. Deterrence is no less important because rights have been violated by a justice of the peace. And, constitutional rights are no less significant because invoked in disciplinary proceedings than if they had been invoked

49

in a criminal proceeding. By avoiding the issues of whether Smartt's right to privacy was violated and whether the evidence seized as a result of that violation should have been excluded from consideration by the Judicial Standards Commission and this Court, the Court has shirked its responsibility to protect not just the rights of Smartt but has provided no protection to the other members of the judiciary and public employees who may in the future, for lack of guidance, lose their privacy to snooping co-workers with an ax to grind. Given the current political climate and conditions under which public employees work, it is already a challenge to maintain morale. Not knowing whether public employees have a right to privacy in personal records kept at their offices or personal communications can only make things worse. After all, if a co-worker can explore the communications and data on a co-worker's computer, is listening in on co-worker phone conversations far behind? I see no valid distinction.

## VIOLATION OF CANONS

¶140 The majority bases its conclusion that Smartt violated Canons of Judicial Ethics on its findings that 1) Smartt accessed sexually explicit images and exposed co-workers to those images; and that 2) he entered the residence of Troy Dye without permission and gave Dye inappropriate advice.

¶141 The problem with the first basis is that while Smartt admittedly accessed sexually explicit images, he did so in the privacy of his office and did not intentionally expose anyone to those images. They were discovered by varying degrees of effort on the part of his co-workers and it was never Smartt's intention that they be discovered. He broke no laws; he

50

violated no policies; he caused the government no expense; and there is no evidence that his activities affected the performance of his job. Furthermore, nothing he did in private undermined or in any way affected public confidence in the judiciary.

¶142 The problem with disciplining Smartt for giving Dye inappropriate advice is that he was never charged with doing so in the complaint filed before the Judicial Standards Commission. This Court has sua sponte latched onto testimony given by Dye during cross-examination and explained by Smartt during his testimony and created a basis for discipline about which Smartt was given no notice and against which he was never given an opportunity to defend. The actual charge against Smartt in relation to Dye was that based on statements made by Dye, Smartt smoked marijuana with him, propositioned him, sexually assaulted him, and entered his home for the purpose of committing a crime. However, the Commission members found that none of Dye's allegations had been proven by clear and convincing evidence and, in fact, found that Dye had little credibility. There was good reason for disregarding Dye's testimony. He had given at least six different statements to six different people; he had at one time or another gone by three different aliases; he had been charged with criminal offenses fifteen to twenty times in the previous ten years, including crimes of dishonesty and violence; and, after investigating Dye's allegations, Rick Lueck from the State Department of Justice found that Dye's version of events was so inconsistent with what he had told other people that he did not know which version to rely on. When the majority state, as they do in ¶ 82, that their decision is in part based on the testimony of Troy Dye, they as much as concede that their decision is not well founded.

51

¶143 The majority and concurring Opinions find that Smartt has brought disrepute on the judiciary and that nothing short of his termination without pay will restore public faith and trust. The majority's conclusion is misguided in several respects. First, it is not Smartt who caused public disrespect for the judiciary. What Smartt did was done behind closed doors in the privacy of his own office. No one else was affected and until it was exposed by his snooping co-worker, the public knew nothing about it. Now, as a result of Samuel Harris's efforts, Smartt has been investigated by the FBI for allegedly viewing child pornography, investigated by the Cascade County Attorney for allegations of sexual harassment, and investigated by the Department of Justice for sexual assault. Following these investigations, none of the allegations were found to be a basis for prosecuting or disciplining Smartt. However, as a result of the investigations and the attendant publicity, Smartt and his family have been humiliated and the judiciary made to look foolish.

¶144 The majority's conclusion that Smartt's prior conduct diminishes the high esteem in which the judiciary is held shows a certain detachment from reality. Only judges and a few members of the bar are so deluded that they think the public expects more of them in the conduct of their personal lives than they expect of other people. The public is way ahead of the judiciary. They know that people elected or appointed to the bench have the same faults, weaknesses and biases as everyone else. All the public hopes for is the fair treatment which was denied in this case. This case is just the most recent example of a judiciary taking itself too seriously.

## DISCIPLINE

¶145  If we are going to start terminating public officials because they use their computers to do something unrelated to their official duties, where will we draw the line? Is this simply going to be the sexual material rule or is this decision going to apply to every use of a computer by a public official which is not directly related to governmental business? If the rule is limited to sexual material, then how offensive does the sexual material have to be and who is going to make that determination? If it is not simply the sexual nature of the material that is at issue, then only those members of the Judicial Standards Commission and this Court who have never used their state or county-owned computer to visit internet sites which are not work related, should participate in this decision.  In fact, everyone who voted to take Smartt's job away should make his or her own hard drive available for unannounced public inspection.  Otherwise, there is a certain ring of hypocrisy to this whole result.

¶146  There are a number of circumstances under which I would consider it appropriate to discipline Smartt.  For example, if he had:

> 1. Used government phones at taxpayer expense to make long distance calls to raise hundreds of thousands of slush fund money to be used for partisan purposes; or
>
> 2. Obstructed investigation of a staff member for something as serious as negligent homicide; or
>
> 3. Received property for a fraction of its actual value from a large corporation with a case before his court; or
>
> 4. Flagrantly violated a fellow co-worker's constitutional rights, such as the right to privacy;

53

then, I would conclude that discipline is appropriate. However, in this case, Smartt's conduct, until he was investigated and prosecuted, did not cost the taxpayers a cent. After thorough investigation, it was concluded that he had not violated any laws and had not sexually harassed anyone in the work place. He did not knowingly expose anyone else to offensive material and there has been no evidence presented in this case that how he spent private time in his chambers in anyway compromised his performance of his job. This Opinion strikingly illustrates the blatant hypocrisy in government which is, after all, the greatest cause of public contempt for and distrust of government. Therefore, if the majority's purpose is to restore public confidence, this decision is a misguided effort.

¶147 Smartt simply viewed material in the privacy of his office which most people consider offensive. For that, his job has been taken away. God protect us from the wrath of the righteous.

_____
　　　　　　　　　　　　　Justice

54